**VIETNAMESE FISHERMEN'S ASSOCIATION, et al., Plaintiffs,**

**v.**

**The KNIGHTS OF the KU KLUX KLAN, et al., Defendants.**

**Civ. A. No. H–81–895.**

United States District Court, S. D. Texas, Houston Division.

July 15, 1981.

Morris Dees, Montgomery, Ala., for plaintiffs.

Sam Adamo, Adamo & Cobb, Houston, Tex., for defendants.

## MEMORANDUM OPINION AND ORDER

McDONALD, District Judge.

### Introduction

This is an action filed on April 16, 1981 by an organization of Vietnamese Fishermen and individual Vietnamese fishermen against the Knights of the Ku Klux Klan, the Grand Dragon of the Ku Klux Klan in the State of Texas, certain unknown members of the Ku Klux Klan, the American Fishermen's Coalition, various alleged members of that coalition, and several individual American fishermen alleging violations of various federal and state statutes.

Specifically, the plaintiffs allege that the defendants have violated their rights under several civil rights statutes: 42 U.S.C. §§ 1981, 1982, 1985(c), and 1986; the Thirteenth and Fourteenth Amendments to the United States Constitution; the Sherman Act, 15 U.S.C. §§ 1, 2, 15, and 26; the Racketeer Influenced and Corrupt Organizations Act (RICO), 18 U.S.C. §§ 1962 and

1964; and the common law torts of assault, trespass to personal property, the intentional infliction of emotional distress and intentional interference with contractual relations. In addition, the plaintiffs allege in their Second Amended Complaint that defendants Louis Beam and the Knights of the Ku Klux Klan have violated their rights under Tex.Rev.Civ.Stat.Ann., art. 5780 § 6 (Vernon). Relief by way of preliminary and permanent injunction has been requested as well as a declaratory judgment.

The plaintiffs seek a preliminary and permanent injunction enjoining the defendants generally from engaging in any activity, including unlawful acts of violence or intimidation, conducted for the purpose of interfering with the rights of the Vietnamese fishermen prior to and during the shrimping season, which begins on May 15, 1981.[1] In particular the plaintiffs request this Court to restrain the defendants from undertaking:

 (a) activities undertaken with the purpose of interfering with the rights of the plaintiff class at issue in this case;

 (b) unlawful acts of violence or intimidation against the plaintiff class;

 (c) engaging, or inciting others to engage in acts of boat burning, armed boat patrols, assault and battery, or threats of such conduct;

 (d) maintaining or conducting or attending military or paramilitary camps and giving or receiving military or paramilitary training except from military institutions operated by the state of Texas or United States government.

The plaintiffs also request this Court to require the conspicuous posting of all Orders as the Court may issue at all meetings and meeting places of any or all of the defendants and to appoint additional United States Magistrates and deputies to prevent the violation of any Orders of this Court.

The plaintiffs' class of Vietnamese fishermen was certified by agreement of all parties on May 8, 1981. The class is defined as "all Vietnamese fishermen in the Galveston Bay, Texas area" and may be maintained under Rule 23(b)(2) of the Federal Rules of Civil Procedure. The defendants' Motion to Dismiss has previously been denied by Order of this Court on May 11, 1981. The Vietnamese Fishermen's Association and the named Vietnamese plaintiffs clearly have standing to represent the plaintiff class. *Warth v. Seldin*, 422 U.S. 490, 511, 95 S.Ct. 2197, 2211, 45 L.Ed.2d 343 (1975), *NAACP v. FPC*, 425 U.S. 662, 96 S.Ct. 1806, 48 L.Ed. 284 (1976); *NAACP v. New York*, 413 U.S. 345, 93 S.Ct. 2591, 37 L.Ed.2d 648 (1973). The testimony and documentary evidence received during the hearing on the Motion for Preliminary Injunction makes it absolutely clear that the claims are justiciable.

The defendants' Motion to Disqualify this Judge was denied after a hearing on May 7, 1981. A separate Memorandum and Order has been entered regarding that motion.

The Court conducted a hearing on the plaintiffs' Motion for a Preliminary Injunction on May 11–14, 1981, during which both the plaintiffs and the defendants presented evidence and oral arguments. Upon the conclusion of said hearing, the Court issues the following Memorandum Opinion and Order.

■ It is well settled that in order to obtain a preliminary injunction the plaintiffs must prove that:

 (1) they have a substantial likelihood of prevailing on the merits;

 (2) there exists a substantial threat of irreparable injury if the injunction is not granted;

 (3) the threatened injury to plaintiffs outweighs the threatened harm the injunction may cause the defendant; and

 (4) granting the injunction will not disserve the public interest.

---

1. Actually the testimony establishes there are four shrimping "seasons", however on May 15 the "no live bait", 300 lb. limit goes into effect and this is when most shrimpers begin to fish.

See *Spiegel v. City of Houston*, 636 F.2d 997 (5th Cir. 1981); *Buchanan v. United States Postal Service*, 508 F.2d 259, 266 (5th Cir. 1975); *Allison v. Froehlke*, 470 F.2d 1123, 1126 (5th Cir. 1972). *See generally* Wright & Miller, *Federal Practice & Procedure*, § 2948. In view of these requirements, the Court will consider each of the causes of action asserted by the plaintiffs to determine whether they have met their burden.

### THE FACTUAL SETTING

On or about January 24, 1981, defendant Fisher was introduced to defendant Louis Beam, Grand Dragon in the State of Texas of the Knights of the Ku Klux Klan (hereinafter KKK or Klan), by defendant James Stanfield a member of the Original Ku Klux Klan of America. (Stanfield Depo. at 13) The admitted purpose for this introduction was for defendant Fisher to secure support of Louis Beam and the Klan in order to further the purposes of a group of American fishermen who were ostensibly concerned about "over fishing" in the Kemah-Seabrook area of Texas. Defendant Fisher considered that the Klan was an organization that had the "courage" to stand by their convictions and would provide needed publicity to draw the attention of various governmental agencies he felt had failed to address his concerns. This meeting resulted in a rally that was held on February 14, 1981 on the property of defendant Joseph Collins that is located in Santa Fe, Texas. Defendant Joseph Collins leased this property for that purpose for a $1.00 payment from Mr. Stanfield. Defendant Fisher testified that he contacted defendant Beam to speak at the rally. Defendant Beam brought with him to the rally approximately 13 men who he refers to as his "security force" who were dressed in military garb and he gave a speech at that rally. He stated in substance that he would give the government 90 days [2] to rectify the situation, (referring to the presence of the Vietnamese fishermen in the Kemah-Seabrook area) and if that was not accomplished the Klan would take action stating it "may become necessary to take laws into our own hands." He admitted stating in his speech that it was necessary to "fight fight fight" and see "blood blood blood" if this country was to survive. That rally was covered extensively by the news media. At that same rally, Beam demonstrated how to burn a boat. A cross propped with the aid of a pickup truck of defendant Joseph Collins was also burned at the rally. On that evening, defendant Beam offered to train American fishermen at one of the "military camps", later referred to as "locations" during his testimony in Court.

On March 15, 1981, a "boat ride" was held in the waters surrounding the Kemah-Seabrook area. The boat was owned by defendant Joseph Collins and was navigated by defendant David Collins. The boat was the shrimping boat used by defendant Joseph Collins in his business, and by his own admission it is hardly a "pleasure craft." Defendant David Collins denies that this boat ride was planned in advance and testified that it was essentially a spontaneous event taken because it was a beautiful day. However, Mr. Emery Waite, a seafood retailer and processor in Seabrook testified that he had heard about the impending boat ride a day or perhaps a week before the boat ride actually took place. Several persons who were on that shrimp boat on March 15, 1981 wore robes of the KKK, some also wore hoods and most were visibly armed. The boat was equipped with a small cannon and a figure hung in effigy. Defendant Stanfield was present on the boat and wore a Klan robe and hood. Other persons who through testimony were clearly identified as being members of the Klan were also on the boat. Defendant Beam testified that he was informed of this boat ride shortly before it occurred and gave his approval to a member of the Klan to wear robes and bear arms, but admonished the members to refrain from any violence. Defendant Fisher, however, testified

---

**2.** The expiration of that ninety day period would have been one day before the opening of the May 15, 1981 spring shrimping season.

that he considered being armed a threat of violence. Other persons who viewed, participated in or heard of this boat ride acknowledged that this display would be fearful and intimidating to Vietnamese fishermen. Indeed, Joanne Oliphant-Curren, a reporter who was invited by David Collins to join them in the boat ride testified that she was "scared." By way of explanation she stated that the presence of robed, armed Klansmen on the boat might incite others to respond in a violent way and acknowledged that if she were a Vietnamese fishermen she would be afraid by such a display. Not only did she testify to this effect, but she reported the account of the boat ride in the April 22, 1981 issue of the *Santa Fe Express News* (Plaintiffs' Exhibit No. 38). She reported that "Collins steered the boat out into the bay well past the mile marker and the Klansmen fired their small cannon (Plaintiff's Exhibit No. 38). Everybody else had their fingers in their ears, but I was snapping pictures and the cannon blast left me nearly deaf for a few moments." The account in the newspaper further related the following: "Let's hear it for the American fishermen, David Collins shouted and the fishermen cheered."

Defendant David Collins acknowledged that the purpose of the boat ride was to gain media attention, asserting "violence sells stories." Defendant Fisher testified that defendant Beam had informed him that one of the persons on this boat ride was a Klansman involved in the Greensboro, South Carolina shooting during which members of the Communist Workers Party were killed during a confrontation with members of the Ku Klux Klan.

Members of the class who testified by deposition also expressed fear because of the presence of the shrimp boat loaded with robed and armed Klansmen. Colonel Nam Van Nguyen testified that he was especially frightened by the weapons that were carried by the persons on the boat and the figure that was hanging in effigy on the boat (Nam Depo. at 54). He also testified that the boat came right to his dock and stopped there for about four or five minutes and someone on the boat gestured toward his house (Nam Depo. at 55). Colonel Nam's sister-in-law, Phuong Pham, was present in his house when the boat approached and she saw persons wearing white robes. This so frightened her that she took her infant niece and ran from the house to a nearby relative's home. Although Miss Pham had previously lived with Colonel Nam, since this incident, she testified that she is too fearful to spend the night in that house. (Pham Depo. at 7–11)

Mr. Jerry Walzel, State Game Warden for the Texas Department of Parks and Wildlife testified that "fortunately" he was not on duty on the day of the boat ride; fortunate because if he had been in the area, undoubtedly he would have received a complaint of possible violations of water safety regulations and if he had tried to board the boat it would have been "like throwing a spark on gasoline." He explained that he would be the spark and the armed Klansman the gasoline. In his opinion, the presence of armed Klansmen aboard shrimp boats would cause violence. That view was concurred in by the Chief of Police of the City of Seabrook. R. W. Kerber testified that he did not expect violence at the opening of the fishing season on May 15, 1981 because there had been no violence the previous year, but admitted that based on his 27 months service as the Chief of Police with extensive contacts with members of the community, he would have no doubt that Vietnamese fishermen would be fearful if there is Klan presence on May 15.

Chief Kerber testified further that the tension between Vietnamese and American fishermen did not stem solely from fishing conflicts. According to Chief Kerber, some American fishermen believe there are just too many Vietnamese people in Kemah-Seabrook and therefore these individuals will only be satisfied when some of the Vietnamese leave the area.

Mr. Louis Beam, the Grand Dragon of the Knights of the Ku Klux Klan of Texas testified about the history of his organization. Mr. Beam stated that the Knights of the Ku Klux Klan of Texas opened a public

information center in Pasadena, Texas in 1975. Prior to that time, he originally joined the United Klans of America in and about April of 1969 immediately after returning from Viet Nam. (Beam Depo. p. 12) According to Mr. Beam's testimony, the United Klans of America was "destroyed" by "government subversion" in 1971. Consequently, in 1973, Mr. Beam helped organize the Original Ku Klux Klan in the state of Texas (hereinafter referred to as the "Original Klan"). (Beam Depo. p. 13)

At trial, Mr. Beam testified that the Original Klan received permission from now former Grand Dragon of Louisiana, Robert W. Fuller, to use the Original Ku Klux Klan of Louisiana's charter. Mr. Beam testified that although the aims of the Louisiana and Texas organizations were different, the Original Klan was incorporated under the laws of Louisiana.

Sometime in late 1974 or early 1975 Mr. Beam advised all the members of the Original Ku Klux Klan of Texas to withdraw their membership from that Klan and affiliate themselves with David Duke's Knights of the Ku Klux Klan out of Metairie, Louisiana (hereinafter referred to as "the Knights"). Mr. Beam subsequently abandoned the charter the Original Klan had operated under and adopted the charter utilized by the Knights. The Knights of the Ku Klux Klan is a national organization and David Duke's group is incorporated under the laws of Louisiana. The Texas Knights of the Ku Klux Klan, of which Mr. Beam is the Grand Dragon, is an unincorporated association. Mr. Beam testified that the goals and objectives of the Texas Knights of the Ku Klux Klan are consistent with those of the Knights. However, he stated he felt the Texas Klan had some unique goals which were not reflected in the national organization.

Mr. Beam refused to reveal the names of the current officers of the Texas Knights of the Ku Klux Klan (Beam Depo. p. 15), and ordered destroyed all records which contained any names of the members of the organization.

The record is replete with provocative statements made by various defendants in this action. Defendant David Collins testified by way of deposition and reaffirmed at trial that he planned to have an armed Klansman on his boat on May 15, 1981. (Collins Depo. at 32, 33) Jim Craig owner of the Old Harbor Seafood House testified that he has 43 boats owned by Vietnamese fishermen docked at his establishment, referred to as the "Saigon Harbor". He testified about a conversation during the Fall of 1980 with defendant Fisher. According to Mr. Craig, Mr. Fisher told him to "watch your boats—they're easy to burn." At trial Mr. Fisher testified that Mr. Craig's memory of the conversation was better than his and did not deny making this statement.[3]

It is uncontroverted that defendant Fisher stated that it would not bother him if the Klan burned all of the [Vietnamese] boats; further adding that the Klan were the only ones with the courage of their convictions. He added that a certain number of Vietnamese boats would have to be taken out of the water and destroyed. At the rally on February 14, 1981, defendant Fisher publicly stated that "we're going to help [Vietnamese fishermen] to control themselves." At trial defendant Fisher equivocated with respect to some of the statements that were attributed to him. For example, he was quoted by the press as saying that he planned to have a squadron of the American fishermen trained at the Klan's paramilitary training camp and that he currently had a group of 50 to 60 American fishermen in training. When confronted with this statement, Mr. Fisher responded that he was "lying" to the press. Mr. Fisher testi-

---

**3.** Paul Grey, a criminal investigator with the Arson Division of the Houston Police Department testified that three boats had been burned in the Kemah-Seabrook area. The first was burned in or about January of 1981 and two additional shrimp boats were burned in March of 1981. He testified that these fires were intentionally set. Two of the boats were owned by Vietnamese and the third was, at the very least, operated by a Vietnamese. However, no one was ever apprehended for these fires.

fied that it was "possible" that he had stated that anyone who traded or did business with or aided or assisted Vietnamese were his enemies. However, defendant Fisher did not deny announcing that his "organization" would put armed men on the boats on May 15, 1981 if requested. (Fisher Depo. at 94) It should be noted that a few of these statements were made during the taking of depositions on or about May 2, 1981 and when Mr. Fisher testified on or about May 11 and 12, he admitted making those statements but said that he no longer felt that way.

A woman who lives in the Galveston Bay area had allowed a Vietnamese fisherman to use one of her docks for approximately two years. She testified that in January, 1981 she received a card in the mail, signed by the Knights of the Ku Klux Klan which read: "You have been paid a 'friendly visit' do you want the next one to be a 'real one.'" She also received three threatening phone calls. The first asked if she knew where her children were; the second was a threat to burn her boat; the third, stated that she would die that night. Mr. Dang, a Vietnamese fisherman, testified that approximately four weeks ago an American pointed a gun at him while he was on his shrimp boat. Miss Do Thi Doi who is a shrimp seller and married to a Vietnamese fisherman testified that six weeks ago two American men drove up in a truck and pointed a gun at her. She testified that unless there is some solution to the conflict between the American fishermen and the Vietnamese fishermen her husband will not take out their shrimp boat on May 15, 1981 because she is afraid that he will be killed.

The plaintiffs have alleged that defendants Beam and the Knights of the Ku Klux Klan have operated one or more military or paramilitary training camps in the State of Texas in violation of Tex.Rev.Civ.Stat.Ann., art. 5780, § 6 (Vernon). The plaintiffs introduced a videotape depicting defendant Beam instructing persons dressed in military type uniforms in the art of psychological warfare, ambush and counter ambush, reconnaissance patrol and other types of military movements. (Plaintiffs' Exhibit 35)[4] Defendant Beam has referred to the group of persons who will receive his training as the "Texas Emergency Reserve." He testified that in addition to civilians, he trained persons who were currently members of the armed forces. The Texas Emergency Reserve has a flag which it uses as an emblem of its organization. A witness with considerable military experience testified that after viewing the entire film footage (approximately four hours of Beam's training sessions) he considers that Beam is training a viable military organization, for it has a command structure, has discipline and is being trained to act as a military unit. In his opinion, this is not the type of training that is provided for survival, but is training to act in a combat role.

Most defendants testified at trial that any assertions they made regarding an explosive situation in the Kemah-Seabrook area and the potential for violence or the need for an armed Klan sea patrol on the opening day of shrimp season, May 15, were no longer valid. Defendants testified that the primary purpose for inviting the Ku Klux Klan to speak on the behalf of American fishermen, was merely an attempt to gain media attention of the plight of the American fishermen because state, federal,

---

4. The defendants objected that this film was a composite of three reels of tape and that the composite inaccurately distorted and slanted the events. The photographer who filmed the original reels agreed with this objection. Plaintiffs' Exhibit 35 was admitted and viewed. However, the Court viewed Plaintiffs' 33, 34, and 36 which by stipulation constitute the entire filming from which the composite (Plaintiffs' Exhibit 35) was made. Admittedly, Plaintiffs' 35 is a film that has been prepared to persuasively support the position of the plain-

tiffs for it primarily consists of scene after scene of defendant Beam issuing instructions in military tactics. After viewing the entire footage (Plaintiffs' 33, 34, and 36), the Court accepts Plaintiffs' 35 as a summary of only portions of the entire footage and a summary primarily depicting Beam issuing instructions. However, having viewed the entire footage, the Court has had an opportunity to observe all of the incidents and will give each of these exhibits appropriate weight.

and local officials had attempted to "whitewash" (Joseph Collins Depo. at 9), the complexity of the nature of the conflict between the American and Vietnamese fishermen. The defendants stated that over the past year and a half to two years they had attempted to present their concerns to Austin with the hope that the Texas legislature would enact legislation designed to curtail the number of boats allowed to fish in the Galveston Bay. According to the defendants, such legislation would significantly decrease the amount of tension that exists between the American and Vietnamese fishermen, and would diffuse any explosive situation that may exist in Kemah-Seabrook. Defendants testified that they understood that the Texas legislature had passed a "limited entry" bill, which was awaiting the Governor's signature, and that another bill establishing a 2:00 p. m. curfew for fishing in the Bay was to be passed shortly by the Legislature. Defendants testified that the existence of this legislation had considerably lessened the American fisherman's concerns about over fishing in Galveston Bay and therefore they did not anticipate any violence or threats of intimidation to occur when the May 15th shrimping season opened.

Mr. Ken King, a legislative assistant to State Representative Lloyd Criss, testified about the status of these two pieces of legislation.[5] Mr. King testified that Governor Clements signed the "limited entry" bill on or about May 12, 1981 and that the bill took effect immediately. This bill places a two year restriction on the issuance of new shrimping licenses by severely limiting the number of persons eligible for shrimping licenses in 1982 and 1983. (Defendants' Exhibit No. 1)[6] Mr. King was not familiar

with the piece of legislation establishing a 2:00 p. m. curfew for fishermen. He testified that to the best of his knowledge that bill was in a House Committee and had been passed by the Senate. Mr. King could not offer any information as to when the "curfew" bill may be approved by the legislature and signed by the Governor.

Mr. King testified that the need for the "limited entry" bill was brought to the attention of Representative Criss by representatives from the Texas Shrimp Association and an association called Pisces. These organizations represented commercial fishermen throughout the Texas gulf coast area. The fishermen's primary concern was that due to a dramatic increase in the issuance of new bay shrimp fishing licenses, it was becoming increasingly difficult to operate a profitable shrimping business in Galveston Bay.

Mr. King testified that the "limited entry" bill was initially drafted in early January 1981. Public hearings were held on the bill, however Mr. King testified he was unfamiliar with any of the defendants to this action and that he never had any conversation with defendant Fisher or any coalition of American fishermen from the Kemah-Seabrook area. Mr. King stated no public testimony was ever received regarding violations of fishing laws and customs by Vietnamese fishermen. Although Mr. King was responsible for drafting the "limited entry" bill he never discussed the issue of overcrowding in Galveston Bay with either Mr. Emery Waite, chairman of the government task force established to resolve conflicts between American and Vietnamese fishermen, or Mr. Charles Travis, executive director of the Texas Parks and

---

5. Representative Lloyd Criss represents a district which includes the Kemah-Seabrook area.

6. The "limited entry" bill provides that the only persons who may be issued a commercial bait shrimp boat license during the calender years 1982 and 1983 would be any person who possessed a commercial shrimp boat license on February 28, 1981 and any person who owned a shrimp boat that was under new construction and that was at least fifty percent completed on March 1, 1981. In addition the bill provides

that during 1982 the Texas Coastal and Marine Council shall conduct studies on shrimp as required by Section 77.004, Parks and Wildlife Code and shall concentrate on factors affecting the status of the bay shrimp industry. The Texas Coastal and Marine Council will then make recommendations on the issuance of shrimping licenses to the Texas legislature and the Governor to aid in their determination of the best shrimp conservation methods.

Wildlife Department. Mr. King testified that when this legislation was drafted he was unaware of any conflicts between American and Vietnamese fishermen in Galveston Bay. He had no knowledge that any threats had been made against Vietnamese or American fishermen or that members of the Ku Klux Klan had offered to provide American fishermen with armed Klansmen on May 15th. Mr. King's only information about the "boat ride" was what he read in the newspaper.

## STATUTORY VIOLATIONS

### 42 U.S.C. § 1985(3)

■ Plaintiffs have alleged that the defendants have conspired for the purpose of depriving them and their class equal protection of the laws and of equal privileges and immunities under the laws and that the defendants have acted out of a class-based animus against Vietnamese persons. (Complaint, ¶ VI, ¶ 2) In *McLellan v. Mississippi Power and Light Company*, 545 F.2d 919, 923 (5th Cir. 1977) (en banc), the elements that a plaintiff must allege and prove for a 42 U.S.C. § 1985(3) cause of action, are set forth as follows:

(1) The defendants must conspire

(2) For the purpose of depriving, either directly, or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws; and

(3) The defendants must act in furtherance of the object of the conspiracy, whereby

(4) One was (a) injured in his person or property or (b) deprived of having and exercising any right or privilege of a citizen of the United States.

There is some authority for the proposition that equal privileges and immunities under the laws portion of 42 U.S.C. § 1985(3) does not apply to aliens. *See United States v. Biloxi Municipal School District*, 219 F.Supp. 691, *aff'd* 326 F.2d 237 (5th Cir. 1963), *cert. denied*, 379 U.S. 929, 85 S.Ct. 324, 13 L.Ed.2d 341. However, at this stage of the proceedings, the Court need not decide this issue since it is clear that aliens are entitled to equal protection of the laws section of 42 U.S.C. § 1985(3). *See Doe v. Plyler*, 628 F.2d 448 (5th Cir. 1980); *In re Griffiths*, 413 U.S. 717, 93 S.Ct. 2851, 37 L.Ed.2d 910 (1973); *Yick Wo v. Hopkins*, 118 U.S. 356, 6 S.Ct. 1064, 30 L.Ed. 220 (1886). Certainly, state action is not required, *Griffin v. Breckenridge*, 403 U.S. 88, 91 S.Ct. 1790, 29 L.Ed.2d 338 (1971); *Paynes v. Lee*, 377 F.2d 61 (5th Cir. 1967). In order to demonstrate a violation of the equal protection of laws section, it must be demonstrated that the plaintiffs have been subjected to racial or other class-based invidious discrimination by the conspirators' actions. The actions of the defendants' conspiracy must demonstrate a violation of some law, independent of § 1985(3).

■ The defendants argue that there has been no conspiracy established. First, they would suggest that the American Fishermen's Association is not an organization but consists of only one person, e. g., defendant Eugene Fisher. That defendant indeed testified that he is an organization of one. However, he admitted that he had collected funds allegedly for the purpose of forming an organization, that he had expended funds in furtherance of the objective of this organization and that on at least one occasion he had a meeting with various American fishermen to discuss the objective of this organization which obstensibly was to file a lawsuit against the federal government. Moreover, in a press release issued by the defendant one day after this lawsuit was filed both Joseph and David Collins as well as Eugene Fisher were named as officers of the organization. Regardless of whether there was in fact a formerly established organization entitled the American Fishermen's Coalition or an organization known by another name consisting of American fishermen which was established or attempted to be established by defendant Fisher, it is clear that the named defendants have acted together and the evidence establishes that those actions have had the effect of depriving the plaintiffs of their equal protection of the laws. The specific

laws that this Court finds have been violated by the defendants will be discussed herein.

## 42 U.S.C. § 1986

The plaintiffs have also alleged that the defendants have violated their rights by engaging in conduct made unlawful under 42 U.S.C. § 1986. Section 1986 is a companion to § 1985. It creates a cause of action against "[e]very person who, having knowledge that any of the wrongs conspired to be done, and mentioned in [§ 1985], are about to be committed, and having power to prevent or aid in preventing the commission of the same, neglects or refuses to do so." *See Dowsey v. Wilkins*, 467 F.2d 1022, 1026 (5th Cir. 1972). *Hamilton v. Chaffin*, 506 F.2d 904 (5th Cir. 1975).

■ The rights protected under § 1986 are those rights which are safeguarded under § 1985; no claim lies under § 1986 except on the basis of a valid claim under § 1985. By its language, § 1986 extends protection to "the party injured" and this is construed the same way the equivalent term in § 1985 is construed. Aliens are protected under § 1986, and since the language authorizes suit against "every person" there is no requirement of state action or color of law under § 1986. 1 C. Antieau, *Federal Civil Rights Acts*, §§ 281–282 (2d Ed. 1980).

■ The testimony elicited at trial clearly established that the defendants had knowledge of the wrongs conspired to be done, and neglected to aid in preventing the commission of these wrongs. David Collins testified that he informed James Stanfield that a "boat ride" had been scheduled and he solicited Stanfield's assistance in inviting people to participate on the boat ride. Mr. Beam testified that he was notified of the boat ride on the morning of its departure. Mr. Beam stated he was informed that

members of the Ku Klux Klan planned to participate in the "boat ride" and he knew these members planned to wear their robes and carry semiautomatic weapons. Although Mr. Beam admonished members of the Klan not to use violence, he did not attempt to dissuade them from joining the boat ride. Both Mr. Stanfield and Mr. David Collins participated fully in the boat ride.

The evidence establishes that all of the defendants were aware that Louis Beam and the Knights of the Ku Klux Klan had been invited to lend their support to the efforts of American fishermen to see a reduction in the number of Vietnamese fishing boats in the Kemah-Seabrook area. Moreover, all of the defendants had knowledge that Louis Beam had been invited to speak at a rally held in Santa Fe, Texas on February 14, 1981 in which he stated that the Klan may have to "take laws into our own hands" if the presence of Vietnamese fishermen in the Kemah-Seabrook area had not been decreased by May 15, 1981.

## 42 U.S.C. § 1981

■ Plaintiffs have alleged that the defendants' actions have denied the plaintiff the same right to make and enforce contracts as is enjoyed by white persons, and have further deprived plaintiffs of the full and equal benefit of laws and proceedings for the security of persons, as is enjoyed by white persons, in violation of 42 U.S.C. § 1981.[7] (Complaint, ¶ IX). When aliens are the victims of racial or other forms of discrimination actionable under § 1981, they have standing to sue under this section. *Takahashi v. Fish & Game Co.*, 334 U.S. 410, 68 S.Ct. 1138, 92 L.Ed. 1478 (1948); *Guerra v. Manchester Terminal Corp.*, 498 F.2d 641 (5th Cir. 1974), *reh. den.* 503 F.2d 567; *Spiess v. C. Itoh & Co.*, 408 F.Supp. 916 (S.D.Tex.1976).

7. 42 U.S.C. § 1981 provides:

Equal rights under the law
All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and to no other.

Section 1981 is constitutionally supported by the implementing of clauses of the Thirteenth and Fourteenth Amendments. *McDonald v. Santa Fe Trail Transportation Co.*, 427 U.S. 273, 96 S.Ct. 2574, 49 L.Ed.2d 493 (1976), on remand 540 F.2d 219 (5th Cir.); *Runyon v. McCrary*, 427 U.S. 160, 96 S.Ct. 2586, 49 L.Ed.2d 415 (1976), later app. 569 F.2d 1294 (4th Cir.), *cert. denied*, 439 U.S. 927, 99 S.Ct. 311, 58 L.Ed.2d 320. In *Jones v. Alfred H. Mayer Co.*, 392 U.S. 409, 436, 88 S.Ct. 2186, 2201, 20 L.Ed.2d 1189 (1968) the Supreme Court indicated that the Civil Rights Act of 1866, which was the forerunner of § 1981, was designed "to prohibit all racial discrimination, whether or not under color of law . . ." and as such was within the constitutional power of Congress under the Thirteenth Amendment. The rationale of the *Jones* case, which authorized a private cause of action for discrimination in the sale or rental of property under 42 U.S.C. § 1982, has been followed in actions under 42 U.S.C. § 1981, *Penn v. Schlesinger*, 490 F.2d 700, 703 (5th Cir. 1973) *cert. denied*, 426 U.S. 934, 96 S.Ct. 2646, 49 L.Ed.2d 385 (1976); *Boudreaux v. Baton Rouge Marine Contracting Co.*, 437 F.2d 1011, 1016 (5th Cir. 1971); *Sanders v. Dobbs Houses, Inc.*, 431 F.2d 1097, 1099 (5th Cir. 1970), *cert. denied*, 401 U.S. 948, 91 S.Ct. 935, 28 L.Ed.2d 231 (1971). Since there is no "state action" or "color of law" requirement under 42 U.S.C. § 1981 private citizens are proper defendants in suits arising out of purely private relationships. *Id. See also: Caldwell v. National Brewing Co.*, 443 F.2d 1044 (5th Cir. 1971), *cert. denied*, 405 U.S. 916, 92 S.Ct. 931, 30 L.Ed.2d 785 (1972).

Section 1981 protects a panoply of individual rights the primary one being the right to contract to earn a living. *E. g., Johnson v. Railway Express Agency*, 421 U.S. 454, 459–60, 95 S.Ct. 1716, 1719–1720, 44 L.Ed.2d 295 (1975); *Penn v. Schlesinger, supra*, 490 F.2d 702; *Guerra v. Manchester Terminal Corp., supra; Boudreaux v. Baton Rouge Marine Contracting Co., supra*. In order to demonstrate a violation of § 1981, it is only necessary that the plaintiffs show that they were unlawfully denied, by the defendants, one of the rights protected by this statute. 1 C. Antieau, *Federal Civil Rights Acts* §§ 32, 33 (2d Ed. 1980).

The plaintiffs argue that the commercial fishing business operates by contract and that the plaintiffs' claims of interference with their ability to participate in this business, and in particular with their ability to make commercial arrangements with dock owners, gives rise to a denial of freedom of contract claim under 42 U.S.C. § 1981. The Court is of the opinion that the plaintiff class has established a substantial likelihood of success on the merits of this cause of action.[8]

Section 1981 also provides that "[a]ll persons . . . shall have the same right . . . to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens." It is well established that the guarantee "to full and equal benefit of all laws and proceedings for the security of persons and property" is a distinct and separate right from the right "to make and enforce contracts." *Strauder v. West Virginia*, 100 U.S. 303, 25 L.Ed. 664 (1879). It is well established that the "full and equal benefit of all laws" guarantee of § 1981 applies to private action. *See Central Presbyterian Church v. Black Liberation Front*, 303 F.Supp. 894, 901 (E.D.Mo.1969). The United States Court of Appeals for the Third Circuit however, has held that the concept of state action is implicit in the "equal benefit" clause of § 1981. *Mahone v. Waddle*, 564 F.2d 1018, 1029–1030 (3rd Cir. 1977), *cert. denied*, 438 U.S. 904, 98 S.Ct.

---

**8.** Private actions under § 1981 which seek to vindicate the right to contract to earn a living have traditionally arisen out of an employment relationship between an employer and employee or an employee and his union. Here, the parties have not raised the issue of whether or not the plaintiff fishermen are employees or independent contractors or whether such a determination is required. At the hearing, the defendants raised no objection to the propriety of the plaintiffs' § 1981 claim. At the trial on the merits, however, this issue will have to be fully briefed.

3122, 57 L.Ed.2d 1147 (1979) (dictum). However, at this stage of the proceedings, the Court need not decide this issue since it is clear that the plaintiffs are entitled to the guarantee of the right "to make and enforce contracts" clause of 42 U.S.C. § 1981.

### 15 U.S.C. § 1

The plaintiffs allege that the defendants' actions constitute a conspiracy to prevent the plaintiffs from engaging in the commercial fishing business, a business in interstate commerce, and further have conspired to prevent other persons from trading with the plaintiffs in this business. The plaintiffs allege that by so doing the defendants have injured and will continue to injure the plaintiffs in their business, and have thereby violated title 15 U.S.C. § 1 of the Sherman Anti-Trust Act. (Complaint, ¶ 11, § 2).

 Section 1 of the Sherman Act provides that "every contract, combination ..., or conspiracy, in restraint of trade or commerce among the several states, ... is declared to be illegal." 15 U.S.C. § 1.[9] Section 1 of the Sherman Act is the broadest in scope of the major antitrust acts, and was designed to protect free and unfettered competition in interstate commerce 1 Von Kalinowski, *Antitrust Laws and Trade Regulation,* § 4.01 (1980). A restraint will be found to violate § 1 if the following factors are present: (1) there are at least two persons acting in concert; (2) the restraint restrains trade or commerce; (3) the trade or commerce is trade or commerce among the several states or within foreign nations; and (4) the restraint is unreasonable. *Standard Oil Co. v. United States,* 221 U.S. 1, 31 S.Ct. 502, 55 L.Ed. 619 (1911); *Aviation v. United Technologies,* 568 F.2d 1186 (5th Cir. 1978).

 Under the Sherman Act any unreasonable restraint that occurs in the flow of interstate commerce or that affects interstate commerce is subject to the provisions of § 1. The terms "trade" and "commerce" have been broadly construed by the courts. 1 Von Kalinowski, *Antitrust Laws and Trade Regulation,* § 4.02 (1980). Practically every commercial activity that is in the flow of or affects interstate commerce constitutes the requisite trade or commerce within the meaning of § 1. *See McLain v. Real Estate Board of New Orleans, Inc.,* 444 U.S. 232, 100 S.Ct. 502, 62 L.Ed.2d 441 (1980). It has been uncontested that the commercial fishing business in Galveston Bay is clearly a part of, and substantially affects interstate commerce within the meaning of § 1 of the Sherman Act.

 Unreasonable restraints fall into two categories, (a) those that are regarded as so inherently anti-competitive that they are illegal *per se*; and (b) those which are found to illegally suppress competition under a "rule of reason" analysis. The elements of a cause of action for an unreasonable restraint of trade under the "rule of reason" have been succinctly stated in *Roberts Waikiki U–Drive v. Budget Rent–A–Car,* 491 F.Supp. 1199 (D.Haw.1980). They are: 1) an agreement among two or more persons; 2) which is intended to harm or unreasonably restrain competition and 3) which actually causes injury to competition. Under the "rule of reason," even though a restraint may have a tendency to suppress competition it may have certain redeeming virtues which, under appropriate circumstances, would not constitute a violation under § 1 of the Sherman Act.

 It has been repeatedly stated that the anti-trust laws protect "competition not competitors" *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.,* 429 U.S. 477, 488, 97 S.Ct. 690, 697, 50 L.Ed.2d 701 (1977). The anti-trust laws do not protect an individual competitor from individual injury to his business. Instead, the anti-trust laws only become operable when there has been

---

**9.** The Sherman Act was amended by the Clayton Act to authorize actions for damages and injunctive relief by private litigants. 15 U.S.C. §§ 15, 26. Section 4 of the Clayton Act, 15 U.S.C. § 15, authorizes the provision of attorney fees and treble damages for injuries suffered by reason of violations of the anti-trust laws. The plaintiffs here are proceeding under these statutes.

a lessening of competitive conditions in the relevant market. *United States v. General Dynamics Corp.*, 415 U.S. 486, 494–498, 94 S.Ct. 1186, 1192–1194, 39 L.Ed.2d 530 (1974). *Northwest Power Products, Inc. v. Omark Industries*, 576 F.2d 83 (5th Cir. 1978), *cert. denied*, 439 U.S. 1116, 99 S.Ct. 1021, 59 L.Ed.2d 75 (1979). A lessening of competitive conditions, can be shown if the number of competitors is reduced appreciably. *Eastern States Retail Lumber Dealers v. United States*, 234 U.S. 600, 34 S.Ct. 951, 58 L.Ed. 1490 (1914). The Supreme Court has stated that a Sherman Act § 1 civil violation may be established by proof of "either an unlawful purpose or an anticompetitive effect. *United States v. United States Gypsum Co.*, 438 U.S. 422, 436, n. 13 [98 S.Ct. 2864, 2873, n. 13, 57 L.Ed.2d 854] (1978); *see United States v. Container Corp.*, 393 U.S. 333, 337 [89 S.Ct. 510, 512, 21 L.Ed.2d 526] (1969); *United States v. National Assn. of Real Estate Boards*, 339 U.S. 485, 489 [70 S.Ct. 711, 714, 94 L.Ed. 1007] (1950); *United States v. Socony Oil Co., supra*, 310 U.S. [150] at 224–225, n. 59 [60 S.Ct. 811 at 844–845, n. 59, 84 L.Ed. 1129] [1940]." [10] *McLain v. Real Estate Board of New Orleans, Inc.*, 444 U.S. 232, 243, 100 S.Ct. 502, 509, 62 L.Ed.2d 441 (1980).

The plaintiffs allege that the defendants have conspired to force the Vietnamese fishermen class to terminate or at the very least curtail their commercial fishing business in the Galveston Bay area. The plaintiffs assert that the defendants have attempted to intimidate them into selling off sixty percent of their shrimping boats and by so doing have acted to eliminate or reduce competition for the American fishermen in the Kemah-Seabrook area. (Complaint, ¶ V, § 2).

It is well established that joint collaborative action designed to eliminate a class of competitors ready and able to compete is a violation of § 1 of the Sherman Act. *United States v. General Motors Corp.*, 384 U.S. 127, 86 S.Ct. 1321, 16 L.Ed.2d 415 (1966); *United States v. Parke, Davis & Co.*, 362 U.S. 29, 80 S.Ct. 503, 4 L.Ed.2d 505 (1960); *United States v. Socony-Vacuum Oil Co.*, 310 U.S. 150, 60 S.Ct. 811, 84 L.Ed. 1129 (1940). Section 1 has been held to apply to an unlawful boycott occasioned by coercion, threats and intimidation. *Loewe v. Lawlor*, 208 U.S. 274, 28 S.Ct. 301, 52 L.Ed. 488 (1908). Moreover, courts have found that foreclosing and eliminating competitors from a substantial portion of the market is *per se* illegal. *See Streiffer v. Seafarers Sea Check Corp.*, 162 F.Supp. 602 (E.D.La.1958).

The plaintiffs argue that the actions of the defendants constitute *per se* violations of the Sherman Act because their actions have a "pernicious affect on competition and lack . . . any redeeming virtue." *Northern Pacific Railroad Company v. United States*, 356 U.S. 1, 5, 78 S.Ct. 514, 518, 2 L.Ed.2d 545 (1958). Although the facts adduced at the hearing may not have established a *per se* illegal restraint such as price fixing or group boycott, the evidence did reveal that the defendants agreed to engage in conduct which had the stated intent of eliminating a class of competitors from the commercial fishing business in Galveston Bay. This type of anticompetitive conduct is not likely to be condoned under Section 1 of the Sherman Act. Therefore, the plaintiffs have shown a substantial likelihood of success on the merits of their Sherman Act § 1 claim.

---

**10.** The United States Court of Appeals for the Ninth Circuit has noted that:

The unlawful purpose referred to is an intent to enter into a conspiracy to violate the antitrust laws. While it is possible that this can be the intent to commit a rule of reason violation, all the cases cited by the Supreme Court involved *per se* violations—usually price-fixing. An unlawful purpose egregious enough to remove the requirement of show-

ing anti-competitive effect, and yet not involving a *per se* violation, is difficult for this Court to imagine.
*Roberts Waikiki U–Drive v. Budget Rent–A–Car*, 491 F.Supp. 1199, 1212 n. 10 (D.Haw. 1980). In the case at bar, however, the defendants have demonstrated an intent to eliminate competition. Such an intent was not present in the Ninth Circuit case.

## TORTIOUS INTERFERENCE WITH CONTRACTUAL RELATIONSHIPS

The plaintiffs have alleged that the actions of the defendants constituted the tort of intentional interference with contractual relationships, i. e., interference with their commercial fishing business. (Complaint, ¶ XIII).

It is well established that a wrongful or malicious interference with the performance or the formation of a contract or the right to pursue a lawful occupation constitutes a tort for which damages may be recovered. *See* 86 C.J.S. Torts, § 43 (1954); Restatement of Torts § 766 (1939). Texas courts recognize a cause of action for improper interference with contractual relationships. *Clements v. Withers*, 437 S.W.2d 818, (Tex.1969). Common law has well established that the reasonable expectancy of a prospective contract is a property right to be protected from wrongful interference in the same sense as an existing contract is protected. *Leonard Duckworth, Inc. v. Michael L. Field & Co.*, 516 F.2d 952 (5th Cir. 1975) [cites omitted]. Under Texas law a party has the right to be free from malicious interference with the right to conduct negotiations that have a reasonable probability of resulting in a contract. *Martin v. Phillips Petroleum Co.*, 455 S.W.2d 429, 435 (Tex.Civ.App.1970) rehearing denied. Texas courts have also recognized a cause of action for tortious and wrongful interference with advantageous business relationships. *Cooper v. Steen*, 318 S.W.2d 750, 757 (Tex.Civ.App.1958).

The elements of the tort of wrongful interference with a prospective contract right are as follows: the plaintiff must show that (1) there was a "reasonable probability that he would have entered into a contractual relationship; (2) the defendant acted maliciously by intentionally preventing the relationship from occurring with the purpose of harming plaintiff; (3) the defendant was not privileged or justified, and (4) actual harm or damage occurred as a result." *Duckworth v. Michael L. Field, supra* at 956 [cites omitted]. As the plaintiffs have stated, the commercial fishing business is essentially contractual in nature. Moreover, the commercial fishing business is a lawful occupation which the plaintiffs have a right to pursue without wrongful interference on behalf of the defendants. The evidence adduced at the hearing clearly established that the defendants acted intentionally to impede and prevent the plaintiffs from pursuing their lawful occupation. As a result of the defendants' actions, many members of the plaintiff class have agreed to sell their shrimping boats and many have been reluctant to pursue their lawful occupation. In light of these facts and the Court's earlier discussion of 42 U.S.C. § 1981, there is a substantial likelihood that the plaintiffs will prevail on this tort claim.

## OTHER CAUSES OF ACTION

The plaintiffs have asserted as additional bases for their injunctive relief, Section 1982 of Title 42 of the United States Code; the Thirteenth and Fourteenth Amendments to the United States Constitution; Section 2 of the Sherman Act, 15 U.S.C. § 2; the Racketeer Influenced and Corrupt Organizations Act (RICO), 18 U.S.C. §§ 1962 and 1964; and the common law torts of assault, trespass to personal property; and the intentional infliction of emotional distress (Original Complaint ¶¶ IX, V, XI, XII, XIII). In addition, the plaintiffs allege in their Second Amended Complaint that defendants Louis Beam and the Knights of the Ku Klux Klan have violated their rights under Tex.Rev.Civ.Stat.Ann., art. 5780 § 6 (Vernon). The Court finds, for the following reasons, that the plaintiffs have not shown a substantial likelihood of success on the merits of these causes of action. On the final day of the hearing the plaintiffs' attorneys informed the Court that they were not going to pursue a cause of action under 42 U.S.C. § 1982 or the Thirteenth and Fourteenth Amendments. Therefore these claims will be dismissed.

Except for the 42 U.S.C. § 1982 claim and the claims under the Thirteenth and Fourteenth Amendments, the remaining additional causes of action are not dismissed at

this time, but will be considered at a trial on the merits.

### 42 U.S.C. § 1982

██ Section 1982 of Title 42 of the United States Code provides that all citizens of the United States have the same right, in every state and territory, as is enjoyed by white citizens thereof to inherit, purchase, lease, sale, hold and convey real and personal property. By its language, § 1982 is available only to "citizens", thus the plaintiff class cannot sustain a cause of action under this statute.

### Fourteenth Amendment

██ The plaintiffs also allege that the defendant deprived the plaintiff class of their right to the privileges and immunities of citizenship, and to the equal protection of the laws, guaranteed by the Fourteenth Amendment. It is well established that a cause of action under the Fourteenth Amendment requires the existence of state action. The plaintiffs have failed to establish, or even assert, that the actions of the defendants were done under color of state law. Therefore, the plaintiff class cannot maintain a direct cause of action under the Fourteenth Amendment of the United States Constitution.

### Thirteenth Amendment

The plaintiffs alleged that their right to be free from the badges and incidence of slavery, protected by the Thirteenth Amendment of the United States Constitution, and their right to interstate travel were violated by the defendants.

██ The Thirteenth Amendment gives power for Congress to create private rights of action versus *private* defendants who deprive individuals of basic rights of free men ("badges and incidents of servitude"). This private right of action is enforceable through 42 U.S.C. § 1981, *Runyon v. McCrary*, 427 U.S. 160, 96 S.Ct. 2586, 49 L.Ed.2d 415 (1976), and § 1985(3). *Griffin v. Breckenridge*, 403 U.S. 88, 91 S.Ct. 1790, 29 L.Ed.2d 338 (1971). However, these statutes define the scope of the cause of action; one cannot try for broader scope by suing under the Thirteenth Amendment itself. *See e. g., Alma Society v. Mellon*, 601 F.2d 1225 (2d Cir. 1979).

This Court is unaware of any authority which would support the proposition that a direct cause of action exists under the Thirteenth Amendment of the Constitution. In *Bivens v. Six Unknown Named Agents of the Federal Bureau of Narcotics*, 403 U.S. 388, 91 S.Ct. 1999, 29 L.Ed.2d 619 (1971) and *Davis v. Passman*, 442 U.S. 228, 99 S.Ct. 2264, 60 L.Ed.2d 846 (1979), the Supreme Court held that direct causes of action existed under the Fourth and Fifth Amendments respectively. The facts of this case, however, differ significantly from those in *Bivens* and *Davis*. These two decisions, therefore, are of limited value in this case.

Since the plaintiffs have dropped their claim for relief directly under the Thirteenth Amendment, the Court need not consider whether such a cause of action actually exists.

### The Common Law Tort of Assault

██ The plaintiffs also alleged that the defendants had committed the common law torts of assault, trespass to personal property, and the intentional infliction of emotional distress. The cause of action for the tort assault recognizes a plaintiff's right to be free from apprehension of a harmful or offensive contact. Any act of such a nature as to excite an apprehension of a battery may constitute an assault. W. Prosser, *The Law of Torts*, (4th Ed. 1971), § 10. It is an assault to hold a weapon in a threatening position, or to surround an individual with a display of force. *Id.* at 38. As a rule, however the defendant's act must amount to an offer to use force, and there must be an apparent ability and opportunity to carry out the threat immediately. There is no assault where the defendant is too far away to do any harm. With respect to weapons, when the defendant presents the weapon in such a manner as to indicate that it may immediately be made ready for use, the threat becomes sufficiently imminent to constitute an assault. *Id.* at 39.

Under Texas law, a person commits an assault if he intentionally or knowingly threatens another with imminent bodily injury. V.T.C.A., Penal Code § 22.01. The definition of assault is the same whether it is the subject of a criminal prosecution or of a civil suit for damages. *Hogenson v. Williams*, 542 S.W.2d 456 (Civ.App.1976). An assault can only be committed when the act is coupled with the ability to commit a battery. For example, if the parties are too far separated for the accused to commit violence with the means used, there is no assault. *Marthall v. State*, 34 Tex.Cr.R. 22, 36 S.W. 1062 (1896).

At the hearing, Miss Do Thi Toi testified that two American men pointed a gun at her. Mr. Dang, another member of the plaintiff class, also testified that an American pointed a gun at him while he was on his shrimp boat. Although these acts may constitute an assault, none of the actions of these Americans could be attributed directly to the defendants.

Several members of the plaintiff class also testified that when they witnessed the "boat ride" on March 15, 1981 they became frightened. Although there were several armed persons on this "boat ride", there was no testimony that any of these individuals were in close enough proximity to any of the plaintiffs to actually commit a battery. It is certainly clear that the actions of the defendants created an atmosphere conducive to the commission of violence and that such violent acts were the foreseeable natural cause of the calls for violence, especially those of defendants Beam and Fisher and acquiesced in by the remaining defendants. At this stage of the proceedings, the Court will not foreclose the plaintiffs from introducing such evidence and further evidence of a direct connection between the defendants and actual acts of assault and battery; however, insufficient evidence has been adduced to demonstrate a likelihood of success on the merits and therefore, the request for preliminary injunctive relief will be denied.

### The Intentional Infliction of Emotional Distress

The plaintiffs' Original Complaint also sought relief from the defendants' alleged intentional infliction of emotional distress. The elements of a *prima facie* case of this intentional tort are: 1) an act by the defendant(s), 2) intent, 3) extreme and outrageous conduct, 4) causation and 5) damages. *See generally*, W. Prosser, *The Law of Torts*, § 12 (4th Ed. 1971).

The evidence adduced at trial demonstrated a substantial likelihood that the "boat ride" constituted extreme and outrageous conduct on the part of defendants David Collins, James Stanfield and several, as yet, unidentified members of the Ku Klux Klan. Colonel Nam's young sister-in-law, Phuong Pham, testified that she was so frightened by the sight of armed and robed Ku Klux Klan members, on the "boat ride," that she ran from Colonel Nam's home and is now afraid to spend the night there. Ordinarily under Texas law, damages for mental anguish and fright are not recoverable unless they result from or are accompanied by physical injury. *See Pargas of Longview, Inc. v. Jones*, 573 S.W.2d 571, 574 (Tex.Civ.App.1978). However, Texas plaintiffs have a damage action for mental/emotional suffering, unaccompanied by physical injury, "when the wrong complained of is a willful one intended by the [defendant] to produce mental anguish or from which such result should be reasonably anticipated as a natural consequence." *Stafford v. Steward*, 295 S.W.2d 665, 667 (Tex.Civ.App.1957) [assault and battery case]. Here, the plaintiffs produced sufficient evidence to establish a substantial likelihood that the defendants intended, or at least could have reasonably anticipated that the "boat ride" would cause plaintiff class members severe emotional/mental distress.

Nevertheless, the facts of this case as well as the governing law need to be more fully developed for the plaintiffs to show a likelihood of success. The plaintiffs have failed to cite any Texas authority allowing a damage action for mental anguish,

unaccompanied by some other intentional tort such as trespass or assault. Moreover, the evidence adduced at the hearing failed to establish that any member of the plaintiff class suffered a mental and/or emotional injury severe enough to maintain a cause of action for the intentional infliction of emotional distress. Phuong Pham is not a member of the plaintiff class. The plaintiffs, therefore, have not demonstrated a substantial likelihood that any of the class members would be entitled to recovery of damages for Ms. Pham's emotional distress. *See Landreth v. Reed*, 570 S.W.2d 486 (Tex. Civ.App.1978).

### Trespass to Personal Property

■■ The plaintiffs have also alleged that the defendants have committed the tort of trespass to chattels. (Complaint ¶ XIII). It is well established that it is a trespass to damage or destroy goods in the possession of another. *See The Law of Torts, supra* § 14. Testimony at the hearing established that in or about January and March of 1981 three Vietnamese owned and/or operated shrimp boats were destroyed by arson. However, there was no testimony to link any of the defendants with this event. Therefore, the plaintiffs have failed to carry their burden with respect to this cause of action.

### RICO

The plaintiffs assert as an additional basis for their injunctive relief the civil remedies provided in the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1964. Section 1964(a) establishes jurisdiction in district courts of the United States to restrain violations of § 1962. § 1962(b) provides as follows:

It shall be unlawful for any person through a pattern of racketeering activity or through collection of an unlawful debt to acquire or maintain, directly or indirectly, any interest in or control of any enterprise which is engaged in, or the activities of which affect, interstate or foreign commerce.

Section 1962(c) provides as follows:

It shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt.

The Court finds, for the following reasons, that the plaintiffs have not shown a substantial likelihood that they will be successful on the merits of a cause of action under the RICO statute.

■ "The two crucial elements which [must be] prove[n] to sustain a conviction under § 1962 are the defendants' association with an 'enterprise' and the existence of a 'pattern of racketeering activity.'" *United States v. Morris*, 532 F.2d 436, 441 (5th Cir. 1976). The plaintiffs have adequately demonstrated that the defendants are associated with an "enterprise" as defined under § 1961(4). The plaintiffs have not, however, established that there was in this case a "pattern of racketeering activity" within the meaning of RICO. Under § 1961(5) there must be at least two acts of racketeering activity, occurring within ten years of each other, in order for there to be a pattern of such activity. "Racketeering activity" is defined in § 1961(1), it includes four broad categories of crimes: (A)ny of several specified acts or threats not specifically alleged herein, (B) any act which is indictable under several specified sections of title 18 U.S.C., (C) acts which are indictable under title 29 U.S.C. involving union funds or loans to labor organizations, or (D) federal offenses involving narcotics or other dangerous drugs. 18 U.S.C. § 1961(1). There has been no substantial showing of any "pattern of racketeering activity" within the meaning of these subsections. The plaintiffs have not alleged any violation of a specific statute identified in this subsection as racketeering activity.

### ARTICLE 5780(6)

■ In their Second Amended Complaint, plaintiffs added a further ground for

relief, based on violation of Tex.Rev.Civ. Stat.Ann., art. 5780 § 6 (Vernon). This statute essentially prohibits the formation of private military organizations. The plaintiffs introduced considerable evidence which indicates that defendant Louis Beam and the Knights of the Ku Klux Klan operate private paramilitary training camps. However, the evidence could not establish exactly where this "camp" was located or whether or not it was still in operation. The language of the statute implies that only those military organizations operating within a "town or city" is prohibited. Here, there was inconclusive evidence as to where defendant Beam's paramilitary camp was located.

■ This statute has never been interpreted by a Texas state court. Therefore, such issues as the constitutionality of the statute and the extent of this court's authority to enjoin a violation of the statute is better left to be considered at a full trial on the merits.

*Section 2 of the Sherman Anti-Trust Act*

■ Finally, the plaintiffs' Original Complaint alleges that the defendants have conspired and attempted to monopolize the shrimping business for the benefit of American fishermen and thus have injured the plaintiffs in violation of § 2 of the Sherman Act. 15 U.S.C. § 2. (Complaint ¶ XI) Section 2 of the Sherman Act provides that any person "who shall monopolize, or attempt to monopolize, or combine or conspire with any other person or persons, to monopolize any part of the trade of commerce among the several States, or with foreign nations," is guilty of a crime. Section 2 proscribes monopolization, i. e. the possession of monopoly power in the relevant market coupled with an intent to exercise that power. *Antitrust Laws & Trade Regulation, supra* at § 7.01[1]. The two essential elements of monopolization are monopoly power and intent. *United States v. Grinnell Corp.*, 384 U.S. 563, 86 S.Ct. 1698, 16 L.Ed.2d 778 (1966). Monopoly power has been defined as the power to fix or control prices or to exclude or control competition. *United*

*States v. E.I. DuPont de Nemours & Co.,* 351 U.S. 377, 391, 76 S.Ct. 994, 1004, 100 L.Ed. 1264 (1956); *American Tobacco Company v. United States,* 328 U.S. 781, 811, 66 S.Ct. 1125, 1139, 90 L.Ed. 1575 (1946). The existence of monopoly power depends upon two factors: (1) a relevant market within which the quantum of power is to be measured, and (2) a degree of power which will be sufficient to control prices or competition. *See E.I. DuPont de Nemours & Co., supra,* 351 U.S. at 393, 76 S.Ct. at 1006. In order to determine whether monopoly power exists, the relevant market must first be defined, then the power of the defendant must be measured in light of the competitive conditions in such market. *Id.*

■ In addition to actual monopolization, § 2 makes it unlawful to attempt to monopolize, or to combine or conspire to monopolize. *Anti-trust Laws & Trade Regulations, supra* at § 7.01[1] p. 7–16. The attempt to monopolize which § 2 prohibits reaches the situation in which there is a "dangerous probability" of monopoly in a relevant market, coupled with a *specific* intent on the part of the prospective monopolist to fix or control prices or exclude competition.

■ Here, no evidence was offered to show that there was a strong likelihood that the defendants possessed the requisite degree of monopoly power in a relevant market. Therefore, the plaintiffs have failed to establish a strong likelihood of success on the merits with respect to an anti-trust violation of § 2 of the Sherman Act.

## CONCLUSIONS

The defendants, Eugene Fisher, Louis Beam, and David Collins have admitted making statements which this Court considers to be intimidating. These uncontroverted provocative statements, coupled with such overt acts as the burning of a shrimp boat and cross at the February 14, 1981 rally, the March, 1981 "boat ride", other cross burnings, the burning of Vietnamese owned and/or operated shrimp boats, and pointing pistols at members of the plaintiff

class and/or their family members [11] convince this Court that the predictable and intended result of the defendants' actions was to interfere with the rights of the plaintiff class. Moreover, as previously noted, the statements themselves constitute intimidation and have a substantial possibility of inciting others to engage in acts of violence and intimidation directed at the Vietnamese fishermen.

The Court has heard testimony from several defendants that certain provocative and threatening statements admittedly made by them should not, for one reason or another, be taken as an expression of their true feelings. These statements, say some of the defendants, were made only for effect, to impress or deliberately mislead the press, or merely for purposes of calling attention to the problems they perceived. The defendants assert that the recently enacted "limited entry" bill, discussed above, has quelled all tension between the American and Vietnamese fishermen. This legislation may indeed ease many of the problems once perceived by American fishermen. The Court, however, remains frankly skeptical of the wholesale reversal of positions taken, in some instances, only days before their repudiation in open court. As the United States Court of Appeals for the Fifth Circuit, quoting decision from a sister court, has eloquently observed,

"Such a last minute change of heart is suspect, to say the least. We recently had occasion to observe in *Lankford v. Gelston*, 364 F.2d 197, 203 (4 Cir. 1966), under somewhat different circumstances, that 'protestations of repentence and reform timed to anticipate or to blunt the force of a lawsuit offer insufficient assurance' that the practice sought to be enjoined will not be repeated." And in a different context we phrased it this way. "What has been adopted can be repealed, and what has been repealed can be rea-dopted. We conclude, therefore, that the plaintiffs are entitled to have their injunction against state action depriving them of their constitutional rights, based on the record at the time the case was tried."

*Jenkins v. United Gas Corp.*, 400 F.2d 28, 33 n. 11 (5th Cir. 1968), quoting *Cypress v. Newport News General & Nonsectarian Hosp. Assoc.*, 375 F.2d 648, 658 (4th Cir. 1967) (en banc).

■ Upon consideration of all the evidence adduced at the hearing, it is the opinion of this Court that the plaintiffs have met their burden of proving a substantial likelihood of success on the merits with respect to the following causes of action: 42 U.S.C. § 1981; 42 U.S.C. §§ 1985(3) and 1986; 15 U.S.C. § 1; and the Texas common law tort of tortious interference with contractual relationships.

The Court also finds that there is an existence of a substantial threat that the plaintiff class will suffer an irreparable injury, if the injunction is not granted. Moreover, the threatened injury to the plaintiff class outweighs the threatened harm that the injunction will cause the defendants, and the granting of the injunction will not disserve the public interest. *See generally*; Wright & Miller, *Federal Practice & Procedure*, §§ 2947, 2948.

■ It is well established that victims of discrimination suffer an irreparable injury regardless of actual pecuniary damage. *See, e. g., United States v. Hayes International Corp.*, 415 F.2d 1038, 1045 (5th Cir. 1969). *See also Bean v. Southwestern Waste Management Corp.*, 482 F.Supp. 673, 677 (S.D.Tex.1979); *Ethridge v. Rhodes*, 268 F.Supp. 83 (S.D.Ohio 1967). Moreover, here the very ability of the plaintiff class to earn a living is being severely jeopardized by the defendants' alleged unlawful actions. Clearly it is in the public interest to enjoin

---

11. No evidence was offered that would establish that any of the defendants committed these last three acts. However, Seabrook Chief of Police, Bill Kerber, testified that an investigation of a May 1980 cross burning under the Kemah-Seabrook bridge indicated that the Ku Klux Klan was responsible for the incident but this was never confirmed. Nevertheless, the Court is convinced that the uncontroverted statements of the defendants have created an atmosphere that would predictably result in intimidation and acts of violence.

self help tactics of threats of violence and intimidation and permit individuals to pursue their chosen occupation free of racial animus.