**VIETNAMESE FISHERMEN'S ASSOCI-ATION, et al., Plaintiffs,**

v.

**The KNIGHTS OF THE KU KLUX KLAN, et al., Defendants.**

**Civ. A. No. H–81–895.**

United States District Court,
S. D. Texas,
Houston Division.

June 3, 1982.

Final Judgment June 9, 1982.

Morris Dees, Montgomery, Ala., David Berg, Houston, Tex., for plaintiffs.

Sam Adamo, Richard Cobb, Houston, Tex., for defendants.

## MEMORANDUM OPINION AND ORDER

McDONALD, District Judge.

### I.

#### Introduction

On April 16, 1981, an organization of Vietnamese fishermen and individual Vietnamese fishermen sued the Knights of the Ku Klux Klan, Louis Beam, individually and as Grand Dragon of the Knights of the Ku Klux Klan for the State of Texas, James Stanfield, the American Fishermen's Coalition, Eugene K. Fisher, Joseph Collins, David Collins, and certain unknown members of the Ku Klux Klan or of the American Fishermen's Coalition for injunctive relief from violations of various rights pro-

tected by federal and state statutes and the United States Constitution. Specifically, plaintiffs alleged that the defendants violated their rights under 42 U.S.C. §§ 1981, 1985(3) and 1986; the Thirteenth and Fourteenth Amendments to the United States Constitution; the Sherman Act, 15 U.S.C. §§ 1, 2, Clayton Act, 15 U.S.C. §§ 15 and 26; the Racketeer Influenced and Corrupt Organizations Act (Rico), 18 U.S.C. §§ 1962 and 1964; and the common law torts of assault, trespass to personal property, the intentional infliction of emotional distress, and intentional interference with contractual relations and with prospective economic advantage. In its Second Amended Complaint plaintiffs charged defendants Louis Beam and the Knights of the Ku Klux Klan [hereinafter Ku Klux Klan or Klan] with violating their rights under Tex.Rev.Civ. Stat.Ann., art. 5780 § 6 (Vernon Supp. 1982). This suit has been certified as a class action under Rule 23(b)(2) of the Federal Rules of Civil Procedure; plaintiff class consists of all Vietnamese fishermen in the Galveston Bay, Texas area.

A lengthy hearing on plaintiffs' Motion for a Preliminary Injunction was held on May 11-14, 1981. On May 14, 1981 the Court entered an Order granting in part and denying in part plaintiffs' Motion. The Court granted a preliminary injunction with respect to the claims under 42 U.S.C. § 1981; 42 U.S.C. §§ 1985(3) and 1986; 15 U.S.C. § 1; and the Texas common law tort of interference with contractual relationships. The plaintiffs' other claims were denied at that time and deferred until the full trial on the merits. On June 8, 1981 the State of Texas was allowed to intervene in the action by Order of the Court. On July 15, 1981, the Court entered its Memorandum Opinion and Order, *Vietnamese Fishermen's Association v. Knights Of The Ku Klux Klan*, 518 F.Supp. 993 (S.D.Tex. 1981), in further support of its May Order. On August 13, 1981, the Court entered an

Order approving the Agreement of the Parties as to a Proposed Order filed August 7, 1981 to: dismiss James Stanfield, Joseph Collins and David Collins as party defendants; convert the preliminary injunction into a permanent injunction against the remaining defendants; and limit the trial on the merits to plaintiffs' and the State of Texas' request for an injunction against the Ku Klux Klan's military operations.

Plaintiffs are now before this Court on the merits of the remaining issue which the parties agree is "the military operations of the Knights of the Ku Klux Klan, otherwise known as the Texas Emergency Reserve." The parties agreed on September 11, 1981 to submit this issue on the testimony presented at the hearing on plaintiffs' Motion for Preliminary Injunction and on depositions filed with the Court. On January 12, 1982 defendants advised the Court that they "specifically waive[d] their right to file written briefs [and] make oral arguments" on the merits of the issue of military operations.[1] On March 3, 1982 the parties and the amicus [2] presented oral arguments regarding the military operations. Subsequently, at the request of the Court, plaintiffs filed post-hearing letter briefs. Defendants declined the Court's invitation to file additional briefs.

Plaintiffs assert that injunctive relief from the military operations of defendant Ku Klux Klan and its Texas Emergency Reserve is justified and proper for two distinct reasons: first, to remedy fully the profound deprivation by defendants of plaintiffs' constitutional rights; and second, to enforce the requirements of Texas law, which proscribes conduct of the sort in which defendants have engaged. In its *Vietnamese Fishermen's* opinion, the Court noted that plaintiffs introduced considerable evidence indicating that defendant Louis Beam and the Knights of the Ku Klux Klan operate private military train-

---

1. Defendants reiterated their position at the March 3, 1982 hearing.

2. The Anti-Defamation League of B'nai Brith was granted leave to file an amicus brief on February 25, 1982.

ing[3] camps, but such evidence did not demonstrate the exact location of the camps or whether they were still in operation. The parties also did not fully explore the relationship between the group called the Texas Emergency Reserve and the Knights of the Ku Klux Klan. Following the preliminary injunction hearing, plaintiffs conducted discovery by way of depositions directed primarily to these issues. Having considered those depositions, the memoranda and arguments advanced the Court finds that the Knights of the Ku Klux Klan have operated military training camps in the State of Texas in violation of Tex.Rev.Civ.Stat.Ann., art. 5780 § 6 (Vernon Supp.1982) and that Louis Beam, individually and as the Grand Dragon of the Knights of the Ku Klux Klan, directed the military operations of the Texas Emergency Reserve as an arm of the Klan.

## II.

### Statement of Facts

The Court's *Vietnamese Fishermen's* opinion fully sets out the facts establishing plaintiffs' right to relief under 42 U.S.C. §§ 1981, 1983 and 1985. The Court found that defendant Beam identified "the group of persons who will receive his training as the 'Texas Emergency Reserve.'" 518 F.Supp. at 1004. Subsequently, defendants explicitly acknowledged in the parties' agreement that "the military operations of the Knights of the Ku Klux Klan" are "otherwise known as the Texas Emergency Reserve," and plaintiffs' depositions further demonstrate that Beam and the Knights of the Ku Klux Klan, styling themselves as the Texas Emergency Reserve, have associated as a military company or organization and have paraded in public with firearms within cities or towns of this State.

### A.

The Texas Emergency Reserve (TER) is a military operation. Plaintiffs' expert witness, Mr. Walter Thomas Wilkinson, testified at the preliminary injunction hearing that the Texas Emergency Reserve had all the elements of a military organization which he defined as "... any unit with command structure, training and discipline so as to function as a combat or combat support unit" (Wilkinson trial testimony, p. 15).[4] The command structure was defined by Mr. Wilkinson as the presence of a leader who takes responsibility, and delegates responsibility to subordinates. He described discipline as the ingredient which enables a military unit to function, and he defined military training as training in the "art of war, the functions of a soldier," including combat and support roles (Wilkinson Test. 11–12).

As noted in the Court's prior opinion, the Court has viewed four hours of film which includes footage of defendant Beam instructing persons dressed in military type uniforms in the art of psychological warfare, ambush and counterambush, reconnaissance patrol and other types of military movements (Plaintiffs' Exhibit No. 35). Mr. Wilkinson considered "teaching the certain aspects of an ambush" a military operation (Wilkinson Dep. 17). The intervenor's military expert, Joe W. Haralson, who also

---

**3.** In that opinion the Court referred to defendants' "paramilitary" activities. *Webster's Third New International Dictionary* (1976) at 1638 defines paramilitary as

 1. existing where there are no military services or existing alongside the military service and professedly nonmilitary but formed on an underlying military pattern as a potential auxiliary or diversionary military organization ... 2. of or relating to a paramilitary organization.

The *American Heritage Dictionary of the English Language* New College Edition (1976) at 951

 1. of or designating forces organized after a military pattern, especially as an auxiliary military force. 2. Relating to such forces.

Since the term "paramilitary" can designate a private military organization not authorized by the state, it is perhaps a more precise term than "military" for the activities in question here. Nevertheless, given the context of this law suit, the Court uses the general term "military" to include "paramilitary."

**4.** Trial testimony is hereinafter cited as "(witness) Test. (page number)." Deposition testimony is hereinafter cited as "(deponent) Dep. (page number)."

viewed the film testified that the training depicted was:

> ... military in nature from all the testimony that was used, the commands, the rank structure. They all tried to be uniform in their dress. The vehicles appeared to be military. I think the whole thing was military or in my opinion it was all military in nature.

(Haralson Dep. 17–18). Beam, himself a man of extensive military experience in Viet Nam, testified that he trained persons who were currently members of the United States armed forces as well as civilians (Beam Test. 51). He asserted that "we have the best training there is" (Beam Test. 44). Mr. Wilkinson testified that after viewing the videotape he considers that Beam is training a viable military organization for combat as opposed to survival (Wilkinson Test. 15).

Neal Payne testified that the Texas Emergency Reserve has a flag with 'TER' on it which it uses as an emblem of its organization. The TER flag was unveiled at a 1979 Klan convention in New Orleans and is kept at the bookstore, i.e. presumably the Klan bookstore in Pasadena (Payne Dep. 31–3). The military character of the Texas Emergency Reserve is underscored by the weaponry used by its members. Defendant Beam, describing a line up of his TER troops at a Santa Fe, Texas meeting on February 14, 1981, named the weapons carried: a riot shotgun, an AR–15 semiautomatic with a 30 round clip, a M–1, and a carbine (Beam Test. 50). Trainees receive training in rifle practice, biological and chemical warfare including the use of gas masks and techniques for avoiding snipers (Peterson Dep. 6; Place Dep. 6–7).

The Texas Emergency Reserve has trained at various locations in the State of Texas. Camp Puller, Sisente's "survival school," has been a principal military training camp for the Texas Emergency Reserve. The camp is a rural tract of land, outside Anahuac, Texas, owned in separate but adjacent parcels by Sisente, Louis Beam, Beam's brother Phillip Beam, an unidentified friend of Beam's, and Dorothy Scaife. A training session was apparently held at Camp Puller as recently as April 1981. Another training site has been Camp Winnie, near Winnie, Texas (Sisente Dep. 17). Still another training site where Payne trained on at least five occasions was Camp Bravo, near Liberty, Texas (Payne Dep. 17, 21). Training has also been conducted at Alpha base, a camp whose location has not been revealed (*Id.*, at 19). At the preliminary injunction hearing on May 13, 1981, defendant Beam admitted that the TER had been actively training about a month and a half earlier in "three different training locations" (Beam Test. 16).

### B.

The Texas Emergency Reserve is as defendants have conceded, the military arm of the Knights of the Ku Klux Klan. The apparent founder of the TER is Robert Sisente, a former military man. Sisente admitted addressing a group of Klansmen in April of 1980 at the home of Ray Wiley, a former Grand Dragon of the Original Knights of the Ku Klux Klan, in which he stated the TER had been created because "the National Guard and military reserve [didn't] have the skills to be effective in a civil disturbance" (Sisente Dep. 11). According to Sisente's testimony the TER had been in operation for at least six years, as of 1980 (Sisente Dep. 12). John Douglas Place, the Klan's chief of security, testified in his deposition that he thought Sisente was the leader of the TER, (Place Dep. 6) and according to Payne, Louis Beam as Grand Dragon would have ultimate control of the TER (Payne Dep. 15).

Sisente claims he coined the name "Texas Emergency Reserve," but abandoned that name after the Ku Klux Klan got involved with his efforts (Sisente Dep. 8). Neal Payne, however, the former head of the Pasadena Klan clavern, stated the Texas Emergency Reserve is an "arm of the Klan ..." (Payne Dep. 51–52), and was established in order to protect the homes and families of its members against any civil disturbance or economic collapse (Payne Dep. 51).

The evidence reveals that the members of the TER are for the most part present and former members of the Ku Klux Klan. Thus, although Robert Sisente claims he has no ties with the TER and that he has incorporated Camp Puller as a "survival school," the evidence demonstrates Sisente's association with the TER and the Klan has been long and close. Sisente, not a member of the Klan himself, acknowledges that he personally was asked to, and did, provide security for a Klan rally at Ray Wiley's house in Morganville, Texas several years after the TER was formed (Sisente Dep. 9–10). Mr. Wiley testified that "the Texas Emergency Reserve military group of the Klan" provided security at his house in 1980 (Wiley Dep. 8), and at rallies on two other occasions. Sisente later participated in a "Border-Watch", conducted by members of the Ku Klux Klan and of the TER.

Both Louis Beam and Neal Payne have conducted training sessions at Camp Puller. Trainees at Camp Puller have included Charles Lee, whom Beam regarded as his "top Lieutenant" and John Place, Chief of the Klan security squad. Klansman Louis Peterson testified that he was a member of the Pasadena clavern for about five months prior to his deposition on July 6, 1981, and that Charles Lee told him to go to Camp Puller for training around April, 1981. Peterson testified further that when he was at Camp Puller about nine other Klan members were training at the camp (Peterson Dep. 5–8). Rick Giesenschligh, a long time leader of the TER, is also a Klansman (Payne Dep. 30–31; Scaife Dep. 22. *See also* Sisente Dep. 15–16). It is obvious from the evidence that members of the TER and the Klan have had interchangeable roles. For example, during his deposition, John Place who acknowledged that he trained with the TER at Camp Puller identified himself in a Klan robe guarding the Klan bookstore in Santa Fe (Place Dep. 6, 34; Exhibit 130),[5] and also in a black "knight hawk" security uniform at the Santa Fe meeting (Exhibit 100). Another example is John Baron who in Exhibit 117 is pictured in full TER military dress with an AR–15 at the Santa Fe rally (Place Dep. 33), and is also shown in Exhibit 142 in a Klan "tee-shirt" on the Klan boat ride with a similar AR–15 (Place Dep. 11–12).

Although Neal Payne claims his Klan membership expired in December 1980, Klansman John Place identified Payne as the Exalted Cyclops of the Pasadena clavern (Place Dep. 5). Payne apparently has played a prominent role in TER activities. Sisente identified Payne as one of the uniformed TER soldiers at the Wiley home in 1980, and testified that Payne was "a good instructor," who "trains pretty regular with me," and who trained at Camp Puller in April, 1981 (Sisente Dep. 19; Exhibit 124). A short while before his July 6, 1981 deposition, Payne appeared on a television interview and stated "that the TER would be glad to patrol the perimeter [of Ellington Air Force Base] outside the fence to help keep [aliens] in" (Payne Dep. 52). He further testified that this offer of "assistance" was cleared with Louis Beam.

Payne's characterization of the Texas Emergency Reserve as an "arm of the Klan . . ." is substantiated by the nature of the activities, or "missions", the TER has engaged in. First, in 1980, members of the TER went to downtown Pasadena, Texas in order to "protect" the Klan bookstore from a rumored attack by communists (Defendants' Exhibits Numbers 127–133 show Klansmen and TER troops gathered in front of this bookstore). Second, as depicted in Exhibits 132–34 the TER came out in full military dress to "protect" a Klan convention in Pasadena, Texas in 1979. Third, there is evidence that both Klan and TER members participated in a Klan-sponsored border patrol in Laredo, Texas (Hartless Dep. 6–7, 12, 28–33).

Fourth, on at least three occasions, Ray Wiley contacted the Texas Emergency Reserve to request TER troops to "protect" Klan meetings held at his home near Morganville, Texas (Wiley Dep. 14–17). The

---

**5.** All exhibits referred to herein, unless noted otherwise, are the photo exhibits to the depositions of Sisente, Payne, Place *et al.* on file with the Court.

most recent known TER troop placement at the Wiley farm was in 1980 (Wiley Dep. 8; Sisente Dep. 10). Mr. Wiley agreed that it was the "Texas Emergency Reserve military group of the Klan" that provided security at his home (Wiley Dep. 8, 17). He testified that the TER was summoned to provide protection because of alleged danger, and admitted that he did not bother to call the local sheriff to seek assistance (Wiley Dep. 16). The TER troops came armed and were prepared to use their guns (Wiley Dep. 15). Photo Exhibits 118–126B depict TER troops at the Wiley home. Among them, Exhibit 119 shows Louis Beam dressed in a white Klan robe standing before two rows of TER troops dressed in camouflaged uniforms in front of Wiley's home (see also Sisente Dep. 14–21; Wiley Dep. 8–13).

Finally, and most significantly for this case, on February 14, 1981 the Knights of the Ku Klux Klan and the American Fishermen's Association held a joint meeting on a farm near Santa Fe, Texas. The meeting was highly publicized; pictures of the troops appeared in print and television media. In addition to camouflaged TER members, black-clad members of the Klan-TER's special security force, were on duty. John Douglas Place, the leader of the Klan's special security force and security force members Glenn Huto, Lee McClain and Johnny Baron have been identified either as TER members, TER trainees, or as participants in the Klan boat ride, along with known TER members (Place Dep. 19–21, 6–7, 32–33, 11–13). Klan-TER forces appeared again at a second Santa Fe Klan-fishermen rally held on May 9, 1981 (Place Dep. 32–33; see Beam Dep. 69–70).

### C.

The Klan and its Texas Emergency Reserve pose a particular threat to the plaintiff class of Vietnamese fishermen. It is readily apparent to this Court that the Ku Klux Klan utilized the Texas Emergency Reserve to train those who wished to intimidate the plaintiffs and then to actually intimidate plaintiffs. This is best illustrated by the fact that the TER was called out to participate in the Klan "boat ride" on March 15, 1981.

On the morning of March 15, 1981 telephone calls were made to TER members to meet on the Kemah side of the creek separating Seabrook and Kemah for the purpose of taking a boat ride (see Beam Test. 39). Beam admits that Charles Lee and an unidentified TER member telephoned him for his approval of the boat ride, which he gave (Beam Test. 39–42). Klansman Jerry Hartless, who claims his Klan membership has lapsed but admits participating in military training on more than five occasions at Camp Winnie (Hartless Dep. 295–27), was telephoned about the boat ride by a person he claims not to remember (Hartless Dep. 13). Hartless called John Douglas Place (Place Dep. 8), and Place in turn called Glenn Huto and Johnny Baron (Place Dep. 10, 12).

During the boat ride, TER members took prominent positions and openly displayed their weapons (see Deposition Exhibits 142–147C). Charles "Big Al" Lee was in full TER military dress and armed with an AR–15 (Exhibits 142 and 145; Place Dep. 15–16; see Beam Test. 42). Place, Baron, and Huto were also armed during the boat ride (Exhibits 142–147C; Place Dep. 11–18).

The boat ride started from a landing on the Kemah side of Clear Lake. The Clear Creek channel which separates the incorporated towns of Seabrook and Kemah, Texas, is used by commercial vessels and pleasure craft on a daily basis and businesses are located on both sides of the channel.[6] The boat ride proceeded down the Kemah side of the channel and returned up the Seabrook side of the channel, at all times staying very close to the bank (D. Collins Dep. 27; 24–29 and Dep. Exhibit D). Former defendant James Stanfield characterized the ride as a "boat parade" and an imitation of the annual "big boat parade" that marks the blessing of the fleet in the Kemah-Seabrook harbor (Stanfield Dep. 27). Former

**6.** The boundary line between Seabrook and Kemah is the center of the channel.

defendant Collins described the ride/parade as a "demonstration" (D. Collins Dep. 14, 15). As this Court has already noted, "Defendant David Collins acknowledged that the purpose of the boat ride was to gain media attention, asserting violence sells stories." 518 F.Supp. at 1002. Photographs clearly show that the boat ride/parade was viewed both by other boats in the channel and by citizens on the docks (Exhibits 144, 145); it also received press coverage.

An effigy of a Vietnamese fisherman, was hung from the rear deck rigging (see Exhibits 144 and 145). Defendant Beam testified that "if the problem [with the Vietnamese fishermen] wasn't solved" he would establish a Klan sea patrol (Beam Test. 47–8). Defendant Fisher testified that the American Fishermen's Association would station armed men on American fishermen's boats if so requested (Fisher Dep. 94). In light of the fact that Fisher testified that the American Fishermen's Association was "an organization of one," namely himself, the Court can only speculate as to where the defendant Fisher would have secured these armed men. However, plaintiffs' contention that Fisher would have solicited the assistance of the Texas Emergency Reserve is not without support.

It is plain to the Court that the boat ride/parade was intended to intimidate and harass members of the plaintiff class and actually had that effect (see Hoang Dep. 13–14; *Vietnamese Fishermen's*, 518 F.Supp. at 1002. The military orientation of defendants is reflected in the statement issued by the Grand Titan of the KKK upon retaining counsel to represent defendants in this law suit, that "[w]e have reason to believe North Vietnamese Communists are infiltrating the ranks of the Vietnamese relocated in the Kemah-Seabrook area ..." (Trial Exhibit 17). As Louis Beam proclaimed at the February Santa Fe rally "the

Ku Klux Klan is more than willing to select out of the ranks of American fishermen some of your more hardy souls and send them through our training camps. And when you come out of that, they'll be ready for the Vietnamese" (Beam Test. 44). Thus, there is no doubt that the Klan's Texas Emergency Reserve has posed a particular threat to plaintiffs.

### III.

### *Conclusions of Law*

The Court faces two independent yet related issues. First, the Court must determine whether an injunction enjoining the remaining defendants from conducting military operations is necessary and appropriate in order to protect the plaintiffs' federal civil rights. Second, the Court must determine whether, pursuant to Tex.Rev.Civ. Stat.Ann., art. 5780 § 6 (Vernon Supp. 1982), it may enjoin defendants from conducting military training camps within the State of Texas.

A. *Injunctive Relief for Violation of Plaintiffs' Civil Rights*

The Court has already concluded that plaintiffs established a substantial likelihood of success on their claims under 42 U.S.C. § 1981, 15 U.S.C. § 1, and state law prohibiting tortious interference with contractual relationships. *Vietnamese Fishermen's*, 518 F.Supp. at 1008, 1010, 1011. The evidence at the preliminary injunction hearing established that the defendants conspired to, and did, deprive the plaintiffs of the equal protection of the law, in violation of 42 U.S.C. § 1985(3). *Id.* at 1006. Similarly, the Court found a clear breach of defendants' duty under 42 U.S.C. § 1986 to assist the prevention of violations of § 1985. *Id.* at 1007. The Court therefore, ordered injunctive relief on May 14, 1981.[7]

---

7. The May 14, 1981 injunction Order provided in relevant part:

[T]he defendants and all persons acting in concert with them are enjoined from:
(1) Engaging in unlawful acts of violence or intimidation against the plaintiff class, including but not limited to—

(a) the placing of an armed person or persons within the personal view of the class of Vietnamese fishermen, their boats, or Vietnamese owned and/or operated establishments with the intended purpose or having the reasonably foreseeable effect of intimidating members of the plaintiff class;

Plaintiffs assert now that additional equitable relief, i.e. an injunction against defendants'[8] military operations, is necessary to fully remedy proven violations of plaintiffs' federal civil rights.

That this Court has power to grant additional injunctive relief is beyond question. Simply put, the Court's power is as broad as the injuries which require remedy. *Milliken v. Bradley*, 433 U.S. 267, 281–82, 97 S.Ct. 2749, 2757, 53 L.Ed.2d 745 (1977) (*Milliken* II) *Swann v. Charlotte-Mecklenburg Board of Education*, 402 U.S. 1, 15, 91 S.Ct. 1267, 1275, 28 L.Ed.2d 554 (1971). Of course, the Court is not empowered to grant relief which would interfere with protected constitutional rights. In this case, however, plaintiffs seek an injunction against actions of the defendants which clearly fall outside the scope of constitutionally protected activity.

The Court's research has disclosed no authority for the proposition that military operations, of the type in issue here, are protected by the First Amendment rights of free speech and freedom of association. As a preliminary matter, it is not clear that defendants' military activities involve "speech" at all, as distinguished from "conduct." While the line between these two is not always clear, the Supreme Court has explicitly endorsed the distinction. In *United States v. O'Brien*, 391 U.S. 367, 376, 88 S.Ct. 1673, 1678, 20 L.Ed.2d 672 (1968), for example, the Supreme Court declared that "[w]e cannot accept the view that an apparently limitless variety of conduct can be labeled 'speech' whenever the person engaging in the conduct intends thereby to express an idea." Defendants' conduct of military operations involves such grave interferences with the public peace and such minimal elements of communication, that, the Court views these activities as impermissible "conduct" not "speech." Indeed, the evidence adduced at the preliminary injunction hearing demonstrated that the TER's public show of force at the Santa Fe rallies and during the boat parade was not "speech" within the meaning of the First Amendment. *See Spence v. Washington*, 418 U.S. 405, 409–11, 94 S.Ct. 2727, 2729, 41 L.Ed.2d 842 (1974) *cf.* L. Tribe, *American Constitutional Law*, § 12–7, at 601 n.20 (1978).

Even if defendants' military operations were characterized as "speech", defendants still would not be able to avail themselves of First Amendment protection. The Supreme Court has long recognized that "fighting words," which "by their very utterance inflict injury or tend to excite an immediate breach of the peace," constitute a narrow category of speech which simply does not fall within the ambit of the First Amendment. *Chaplinsky v. New Hampshire*, 315 U.S. 568, 572, 62 S.Ct. 766, 769, 86 L.Ed. 1031 (1942). As this Court concluded in *Vietnamese Fishermen's*, 518 F.Supp., at 1016, provocative statements by defendants constituted intimidation and had a substantial possibility of inciting others to engage in acts of violence and intimidation directed at the Vietnamese fishermen. Such provocative statements are a classic example of "fighting words." Similarly, the threat of violence which defendants communicated through their military activities is precisely such an irrefutable and dangerous "communication" that it resembles the use of "fighting words," and therefore is not protected by the First Amendment. *See* L. Tribe, *supra*, § 12–8, at 605 (1978).

(b) the burning of crosses on property within the geographic area where members of plaintiffs' class live and/or work without the consent of the owner of said property;

(c) gatherings of two or more robed members of the Knights of the Ku Klux Klan or affiliated Klan organizations within the personal view of members of the class.

(2) Engaging, or inciting others to engage in acts of boat burning, armed boat patrols, assault and battery, or threats of such conduct; and

(3) Any other unlawful activities undertaken with the intended purpose or having the reasonably foreseeable effect of intimidating or harassing the members of the plaintiff class.

8. For the purposes of this further relief, defendants hereinafter are Louis Beam, the Knights of the Ku Klux Klan and certain unknown members of the KKK.

 Even if the Court were to assume that the defendants conduct was an exercise of free speech, this conduct could be properly regulated under the standards of *United States v. O'Brien*, 391 U.S. 367, 88 S.Ct. 1673, 20 L.Ed.2d 672 (1968). Under *O'Brien*:

> a governmental regulation is sufficiently justified if it is within the constitutional power of the Government; if it furthers an important or substantial governmental interest; if the governmental interest is unrelated to the suppression of free expression; and if the incidental restriction on alleged First Amendment freedoms is no greater than is essential to the furtherance of that interest.

*Id.* at 391 U.S. 377, 88 S.Ct. at 1679.[9] Here, the State of Texas has attempted to regulate the type of military "communication" engaged in by defendants. By virtue of Tex.Rev.Civ.Stat.Ann., art. 5780 § 6 (Vernon Supp.1982),[10] the State of Texas has statutorily prohibited the very conduct which plaintiffs urge the Court to enjoin.[11] The State has the power to regulate the formation of private armies. In *Presser v. Illinois*, 116 U.S. 252, 267, 6 S.Ct. 580, 585, 29 L.Ed. 615 (1886), the Supreme Court declared that:

> Military operation and military drill and parade under arms are subjects especially under the control of the government of every country. They cannot be claimed as a right independent of law. Under our political system they are subject to the regulation and control of the state and federal governments, acting in due regard to their respective prerogatives and powers.

*See also United States v. Cruikshank*, 92 U.S. 542, 23 L.Ed. 588 (1876). Weighty governmental interest also counsel against acceptance of any argument that the First Amendment protects military operations. As a New York Appellate Court has observed:

There can be no justification for the organization of such an armed force. Its existence would be incompatible with the fundamental concept of our form of government. The inherent potential danger of any organized private militia, even if never used or even if ultimately placed at the disposal of the government, is obvious. Its existence would be sufficient, without more, to prevent a democratic form of government, such as ours, from functioning freely, without coercion, and in accordance with the constitutional mandates.

*Application of Cassidy*, 268 App.Div. 282, 51 N.Y.S.2d 202, 205 (1944), *aff'd*, 296 N.Y. 926, 73 N.E.2d 41 (1947). This governmental interest is not intended to, nor does it, suppress free expression. Finally, any restriction which an injunction of military activities would place on defendants' free expression is minimal; defendants remain free to express their views by means other than the threat of military force.

Defendants' military training operations are similarly outside the scope of the First Amendment freedom of speech and association. Professor Laurence Tribe defines an abridgement of the First Amendment freedom of association as "any insufficiently justified governmental rule, practice or policy that interferes with or discourages a group's pursuit of ends having special first amendment significance—such as literary expression, or political change, or religious worship." Tribe, *supra*, § 12–23, at 703. An injunction against defendants' military training operations in no way hinders defendants from meeting together as a group. Rather, it simply limits their ability to engage in a certain pattern of noncommunicative conduct which threatens to incite a breach of the peace. The First Amendment is no defense to a charge of conspiracy even if the act was committed for political or ideological reasons. So too, defendants'

---

9. In *O'Brien* the Supreme Court was concerned with governmental proscriptions of "conduct" which combined both "speech" and "non-speech" elements.

10. See n. 14 *infra*.

11. See pp. 217–219 of this Order for a discussion of the applicability of this statute to defendants' conduct.

particular political motivations do not entitle them to transgress the law under the guise of the First Amendment. *Id.*, § 12–7 at 601.

 An injunction against defendants' military activities does no violence to the Second Amendment.[12] By its express language, that Amendment prohibits only such infringement on the bearing of weapons as would interfere with "the preservation or efficiency of a well regulated militia," organized by the State. *United States v. Miller,* 307 U.S. 174, 178, 59 S.Ct. 816, 818, 83 L.Ed. 1206 (1939); *United States v. Birmley,* 529 F.2d 103, 107 (6th Cir. 1976). Here, the State of Texas, which absent contrary federal action is "the sole judge" of the steps to be taken to maintain its militia, *see Hamilton v. University of California,* 293 U.S. 245, 260, 261, 55 S.Ct. 197, 203, 79 L.Ed. 343 (1934), has itself statutorily prohibited the operation of private armies. Tex.Rev.Civ.Stat.Ann., art. 5780 § 6 (Vernon). In short, the Second Amendment does not imply any general constitutional right for individuals to bear arms and form private armies. *See United States v. Miller,* 307 U.S. 174, 59 S.Ct. 816, 83 L.Ed. 1206 (1939); *United States v. Cruikshank,* 92 U.S. 542, 553, 23 L.Ed. 588 (1876).

 Since no constitutional limitations exist on the relief plaintiffs seek, equitable principles dictate that an injunction against the military operations of the Knights of the Ku Klux Klan and its Texas Emergency Reserve (TER) should be awarded in order to prevent injury to the rights of the plaintiff class. Although Louis Beam testified that military training had been greatly curtailed in the wake of this litigation, he has not contended that the military training operations have been terminated (Beam Test. 16). None of the defendants have claimed to have disbanded the TER. To the contrary, the TER made a public show of force in Santa Fe, Texas for a Klan-fisherman rally on May 9, 1981, well after this law suit began (Place Dep. 32–33; Beam

Dep. 69–70). In the summer of 1981, Neal Payne, appeared on television, with defendant Beam's approval to offer TER's assistance in keeping immigrant aliens inside of Ellington Air Force Base Compound (Payne Dep. 51–52).

There is no reason to believe that the Vietnamese fishermen are now free of intimidation by the remaining defendants. As this Court noted in *Vietnamese Fishermen's,* 518 F.Supp., at 1016, quoting *Jenkins v. United Gas Corp.,* 400 F.Supp. 28, 33 n.11 (5th Cir. 1968), "'protestations of repentance and reform timed to anticipate or to blunt the force of a law suit offer insufficient assurance that the practice sought to be enjoined will not be repeated.'" In *United States v. W. T. Grant Co.,* 345 U.S. 629, 632, 73 S.Ct. 894, 897, 97 L.Ed. 1303 (1953), the Supreme Court stated the "voluntary cessation of allegedly illegal conduct does not deprive the tribunal of power to hear and determine the case, i.e., does not make the case moot." The evidence reveals that the TER has been training, under one name or another, for approximately six years (Sisente Dep. 12) and defendants have made absolutely no representations that they intend to dismantle the TER or discontinue their military training operations.

It is readily apparent to this Court that defendants utilized TER forces to intimidate the plaintiff class and to deprive them of their civil rights. In addition, the Ku Klux Klan boldly offered to train individuals, who wished to intimidate members of the plaintiff class, at their military training locations. Although the May 14, 1981 Order of this Court enjoined both the former and remaining defendants from any future intimidation or deprivation of plaintiffs' rights generally, it did not specifically address the Ku Klux Klan's military organization, the TER. And it is the TER which enables the Knights of the Ku Klux Klan and those who conspire with them, to perpetuate their threats of intimidation and violence toward the plaintiff class and pro-

---

**12.** The Second Amendment to the United States Constitution provides, "[a] well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed."

vide the wherewithal to carry out those threats.

The evidence attests to the gravity of the danger of continued violation of plaintiffs' rights, and there is no tenable constitutional claim which protects the defendants' military conduct. Accordingly, equity considerations compel this Court to grant plaintiffs' request of injunctive relief to prohibit defendants' military operations.

### B. *Injunction Against Defendants' Violation of Article 5780 § 6*

Plaintiff class and plaintiff intervenor, State of Texas, have requested an injunction against the Knights of the Ku Klux Klan's military training operations on the ground that such operations are a violation of Texas state law. Like twenty-four other states[13] Texas has adopted statutory limitations on private military activity. These limitations, set out in Tex.Rev.Civ.Stat. Ann., art. 5780 § 6 (Vernon Supp.1982) [hereinafter "article 5780(6)"], apply independently of federal law, and therefore provide an independent basis for the relief plaintiffs seek. In pertinent part, article 5780(6) states, "no body of men, other than the regularly organized state military forces of this State and the troops of the United States, shall associate themselves together as a military company or organization or parade in public with firearms in any city or town of this state ..."[14] A preliminary question in determining whether this Court may enjoin the Ku Klux Klan's military training operations as a vio-

lation of state law, is whether the plaintiff class has standing to seek the enforcement of article 5780(6).

It is well settled under Texas common law that individuals have standing to seek enforcement of public statutes either if the right to sue is specifically conferred by statute, or if they can make a showing of special injury, damage, or harm. *See, e.g., Scott v. Board of Adjustment,* 405 S.W.2d 55, 56 (Tex.1966); *San Antonio v. Stumberg,* 70 Tex. 366, 7 S.W. 754, 755 (Tex.1888); *Lemons v. Wylie,* 563 S.W.2d 882, 883 (Tex.Civ.App.1978); *Lozano v. Patrician,* 483 S.W.2d 369, 371–72 (Tex.Civ. App.1972); *American Construction Co. v. Seelig,* 131 S.W. 655, 658 (Tex.Civ.App. 1910), *aff'd,* 133 S.W. 429 (Tex.1911). This "special injury" standard applies even when the acts sought to be enjoined violate penal statutes for which the state might be thought to have the clearest interest in exclusive enforcement responsibility. *See e.g., Gluck v. Texas Animal Health Commission,* 501 S.W.2d 412, 415 (Tex.Civ.App. 1973); *I. B. E. W. Local 278 v. Southwestern Bell Co.,* 498 S.W.2d 504, 506 (Tex.Civ. App.1973). *Cf.* Spears & Sanford, *Standing to Appeal Administrative Decisions in Texas,* 33 Baylor L.Rev. 215, 216–218 (1981) (administrative standing under Texas common law).

The special injury requirement has been stated in various terms, e.g. "persons aggrieved," "persons adversely affected,"

---

**13.** *See* Ala.Code § 31–2–125; Ariz.Rev.Stat. § 26–123 (1981 Supp.); Cal.Penal Code § 11460; Conn.Gen.Stat.Ann. §§ 27–101, 27–102; Fla.Stat.Ann. § 870.06; Idaho Code § 46–802; 111 Ann.Stat., ch. 129, § 220.94; Iowa Code Ann. § 29A.31; Kan.Stat.Ann. § 48–203; Ky.Rev.Stat.Ann. § 38.440; La.Rev.Stat.Ann. § 29.31; Me.Rev.Stat. tit. 37–A, § 1107; Md. Ann.Code Art. 65 § 35; Mass.Gen.Laws Ann., ch. 33, §§ 129–31; Mich.Comp.Laws Ann. § 750.402; Miss.Code Ann. § 33–1–31; Neb. Rev.Stat. § 55–176, 177; Nev.Rev.Stat. § 203.-080; N.Y.Mil.Law § 240 (1980 Supp.); N.C. Gen.Stat. § 127A–151; N.D.Cent.Code § 37–01–21; Wash.Rev.Code Ann. § 38.40.120; West Va.Code § 15–1F–7; Wyo.Stat. § 19–1–106.

**14.** Article 5780(6) provides in full:

No body of men, other than the regularly organized State Military Forces of this state and the troops of the United States, shall associate themselves together as a military company or organization or parade in public with firearms in any city, or town of this State; provided that students in the educational institutions where military science is a prescribed part of the course of instruction, and soldiers honorably discharged from the service of the United States may, with the consent of the Governor, drill and parade with firearms in public. Nothing herein shall be construed to prevent parades by the active militia of any other state as hereinafter provided.

"party in interest," persons "whose rights are substantially affected," and persons having "special interest in the subject matter." *See e.g., Scott v. Board of Adjustment,* 405 S.W.2d 55, 56 (Tex.1966); *City of San Antonio v. Stumberg,* at 7 S.W. 755; *San Antonio Conservation Society v. City of San Antonio,* 250 S.W.2d 259, 263 (Tex.Civ. App.1952). The scope of interests represented by the various terms used to express the "special injury" requirement, parallels those represented by the injury in fact requirement necessary to confer standing in federal court. Spears & Sandford, *supra* at 227–233 and authorities cited therein. *See also Finch v. Mississippi State Medical Ass'n, Inc.,* 585 F.2d 765, 771 (5th Cir. 1975) (in absence of particularized injury federal litigant lacked standing to sue). The interests, therefore, which confer standing under Texas common law include "life, liberty, property, ... peace, ... happiness, or quality of life." Spears & Sandford, *supra* at 229 and authority cited therein.

█ Here, facts establish that members of the plaintiff class have suffered extensive special injury not shared by the general public. Most notably, the Ku Klux Klan's military activities were not directed towards the general population of Kemah-Seabrook, but instead were directed specifically against this class of Vietnamese fishermen. That the plaintiff class is subject to special injury separate and distinct from that of the general public was clearly manifested by defendant Beam at the Klan-fishermen rally held in Santa Fe, Texas in March, 1981 when he stated:

> ... (inaudible) I think most emphatically and positively that the Ku Klux is more than willing to select out of the ranks of American fishermen some of your most hearty souls and send them through our training camps. And when you come out of that, they'll be ready for the Vietnamese. We have the best training there is
>
> ...

(Beam Test. 44). The Klan-TER forces provided security at both the February and May, 1981 Santa Fe, Texas rallies (*see* Place

Dep. 32–33; Beam Dep. 69–70). Moreover, the Klan-TER forces were highly visible in the boat parade, the most intimidating of defendants' various actions towards the plaintiff class. Plaintiffs have also suffered a distinct pecuniary injury, *see Vietnamese Fishermen's,* 518 F.Supp. at 1007–1011, sufficient to confer standing. *See American Construction Co. v. Seelig,* 131 S.W. 655 (Tex.Civ.App.1910), *aff'd* 133 S.W. 429 (Tex.1911).

Defendant Beam has repeatedly testified that his Klan organization "stand[s] for the rights of white people" (Beam Test. 43). In addition Beam testified that he perceived the dispute between the American and Vietnamese fishermen as one in which the federal and state government had "turned their backs on the citizens of this county in favor of non-citizens" (*Id.*). The general public is harmed by the Ku Klux Klan's usurpation of the State's right to the exclusive control of military force within its borders, but for most citizens this injury is almost wholly abstract. The plaintiffs however, are among the few members of the public whom the defendant's private militia has singled out as a target of intimidation and harassment. Clearly, unlike the general public, the plaintiff class' federal civil rights have been deprived as a result of the Klan-TER military operations. The particular injuries which the plaintiffs have suffered are exemplars of the "special injuries" which provide a base for individual standing under Texas common law.

Given that both precedent and policy establish plaintiff's right to enforce article 5780(6), the Court concludes that the plaintiff class is entitled to seek an injunction prohibiting defendants' violations of article 5780(6).

### C. *This Court's Jurisdiction Over the State of Texas' Request for an Injunction*

█ By Order of this Court on June 8, 1981, the State of Texas was allowed to intervene in this action pursuant to Rule 24(b)(2) of the Federal Rules of Civil Proce-

dure.[15] In its Complaint in Intervention the State of Texas requested this Court to permanently enjoin and restrain defendants from forming a paramilitary organization or conducting paramilitary camps in violation of article 5780(6). The intervention of the State of Texas was allowed without objection by defendants. Although defendants have not contested this Court's jurisdiction in that regard, the Court must determine the propriety of its jurisdiction over the State of Texas' claim. *E.g., United States v. Local 638, Enterprise Association*, 347 F.Supp. 164, 165 (S.D.N.Y.1972).

The decision to permit intervention under Rule 24(b)(2) requires a threshold determination that "the applicant's claim or defense and the main action have a question of law or fact in common." Fed.R.Civ.P. 24(b)(2). If this requirement is met, then the district court must exercise its discretion in determining whether to permit intervention. *Stallworth v. Monsanto Co.*, 558 F.2d 257, 269 (5th Cir. 1977). There is no question here that the State of Texas' claim under state law arises out of the same "common nucleus of operative fact" as the plaintiffs' federal claims and is identical to plaintiffs' state claim seeking the enforcement of article 5780(6). *See United Mine Workers v. Gibbs*, 383 U.S. 715, 727, 86 S.Ct. 1130, 1139, 16 L.Ed.2d 218 (1966).

 The request by plaintiff class for an injunction against defendants' violation of article 5780(6) is properly before the Court under the principles of pendent jurisdiction. *See United Mine Workers v. Gibbs*, 383 U.S. 715, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966). The argument for exercising pendent jurisdiction over the plaintiffs' state claim is particularly strong because of the close nexus between the state and federal claims for relief from defendants' military operations.

 It is clear that there is no independent jurisdictional base for the State of Texas' action against defendants. Although the commentators state what seems to be an absolute rule, i.e., permissive intervention requires an independent federal jurisdictional base, their main concern appears to be with unwarranted expansion of federal diversity jurisdiction. *See* 3B J. Moore & J. Kennedy *Moore's Federal Practice* ¶ 24.18 (2 ed. 1981); 7A C. Wright & A. Miller, *Federal Practice & Procedure*, § 1917 (1972). *See also, e.g., Owen Equipment & Erection Co. v. Kroger*, 437 U.S. 365, 98 S.Ct. 2396, 57 L.Ed.2d 274 (1978) (ancillary jurisdiction not extended to plaintiff's claim against nondiverse third-party in a diversity action); *Zahn v. International Paper Co.*, 414 U.S. 291, 94 S.Ct. 505, 38 L.Ed.2d 511 (1973) (in a diversity class action each member of the plaintiff class must independently satisfy the jurisdictional amount required by the federal diversity statute). Relevant case law makes clear however, that under proper circumstances, permissive intervention is allowed, in the absence of an independent federal jurisdictional base, where "pendent party" jurisdiction exists. Thus, the Court concludes that intervenor State of Texas is properly before this Court under the doctrine of pendent party jurisdiction.

In *United States v. Local 638, Enterprise Association*, 347 F.Supp. 164 (S.D.N.Y.1972), the United States District Court for the Southern District of New York considered and granted a petition in intervention by the New York City Commission on Human Rights, as a party plaintiff, finding "neither precedent in the Supreme Court nor in [the Second Circuit Court of Appeals] for the

**15.** Rule 24(b) provides:

Upon timely application anyone may be permitted to intervene in an action: (1) when a statute of the United States confers a conditional right to intervene; or (2) when an applicant's claim or defense and the main action have a question of law or fact in common. When a party to an action relies for ground of claim or defense upon any statute or executive order administered by a federal or state governmental officer or agency or upon any regulation, order, requirement, or agreement issued or made pursuant to the statute or executive order, the officer or agency upon timely application may be permitted to intervene in the action. In exercising its discretion the court shall consider whether the intervention will unduly delay or prejudice the adjudication of the rights of the original parties.

view that a permissive intervention, in an action which is not *in rem*, can never be allowed in the absence of an independent federal jurisdictional base." *Id.* at 168. The Court took exception to the general rule requiring independent jurisdiction, finding that it was grounded in the fear that litigants would manipulate federal diversity jurisdiction. The Court concluded that since the main claim in that action involved a federal question, "it [was] hardly a large step, ... to extend the doctrine of pendent jurisdiction to pendent parties (who really represent a class) even though the additional 'claim' is not independently susceptible to federal adjudication. [Citations omitted]" *Id.* at 168. The court reasoned further that permissive intervention in federal question actions "does not lend itself to a possible collusion to confer federal jurisdiction which could exist in diversity cases, because federal question jurisdiction cannot so easily be manufactured." *Id.* This Court is of the opinion that the reasoning of *Local 636* is sound and should be followed with respect to the State of Texas' intervention.

There apparently is no Fifth Circuit authority directly on the question of permissive intervention under pendent party jurisdiction, although it has held that ancillary jurisdiction cannot support the presence of permissive intervenors. *Warren G. Kelban Engineer Corp. v. Caldwell*, 490 F.2d 800, 802 (5th Cir. 1974). *Kelban*, however, did not involve a federal question and the district court incorrectly assumed it had ancillary jurisdiction over the action. In reversing the district court's assumption the Court of Appeals found *Kelban* involved facts "well outside the established bounds of ancillary jurisdiction." *Id.* at 802–803. In its most recent discussions of permissive intervention, the Fifth Circuit omits any mention of jurisdiction, and simply instructs the trial court to determine whether "the applicant's claim or defense and the main action have a question of law or fact in common." Fed.R.Civ.P. 24(b)(2). *Howse v. S/V "Canada Goose I"*, 641 F.2d 317, 322 (5th Cir. 1981); *Stallworth v. Monsanto Co.*, 558 F.2d 257, 269 (5th Cir. 1977). Admittedly, the would be intervenors in *Howse* and *Stallworth* unlike the State of Texas in the case at bar, sought to protect their rights which were being litigated in the main federal claim and did not raise a pendent state claim. The Court has clearly stated that once the "interest" requirement hurdle is past,[16] a district court's decision to allow intervention is reviewable only for a clear abuse of discretion. *Id.*

Two years after the Fifth Circuit decided in *Kelban* that ancillary jurisdiction could not support permissive intervention, the concept of pendent party jurisdiction was discussed by the Supreme Court in *Aldinger v. Howard*, 427 U.S. 1, 96 S.Ct. 2413, 49 L.Ed.2d 276 (1976). The Fifth Circuit expressly recognized the *Aldinger* doctrine of pendent party jurisdiction in its recent decision *Boudreaux v. Puckett*, 611 F.2d 1028 (5th Cir. 1980). *Accord Arango v. Guzman Travel Advisors Corp.*, 621 F.2d 1371, 1377 n.7 (5th Cir. 1980). *Aldinger* did not address permissive intervention, but its analysis of pendent party jurisdiction over a third party defendant is instructive on the question of the necessity of independent federal jurisdiction.

In *Aldinger* the Supreme Court found that the question "whether the doctrine of pendent jurisdiction extends to confer jurisdiction over a party as to whom no independent basis for jurisdiction exists," *id.* at 2–3, 96 S.Ct. at 2414, requires a two-step analysis. First, it must be ascertained whether the main federal claim together with the third-party state claim constitute a "case" as required by Article III of the United States Constitution. The *United Mine Workers v. Gibbs*, "common nucleus of operative fact" formula is utilized to determine whether a "case" exists. If it does, the second step is to determine whether

---

**16.** The "interest" requirement of Rule 24(a)(2) has been liberally construed by both the Supreme Court and the Fifth Circuit. *See e.g., SEC v. United States Realty & Improvement Co.*, 310 U.S. 434, 459, 60 S.Ct. 1044, 1054, 84 L.Ed. 1293 (1940); *In re Estelle*, 516 F.2d 480, 485 (5th Cir. 1975), *cert. denied*, 426 U.S. 925, 96 S.Ct. 2637, 49 L.Ed.2d 380 (1976).

Congress intended the jurisdictional statutes, under which the main federal action is brought, to preclude the third-party to whom pendent jurisdiction would apply. In *Aldinger*, the Supreme Court refused to confer pendent party jurisdiction because the target third-party defendant was not within the reach of 42 U.S.C. § 1983, the federal statute upon which the main claim was based. The Court, however, was at pains to point out that it was not formulating "any general common all-encompassing jurisdictional rule." *Aldinger v. Howard*, 427 U.S. at 14, 96 S.Ct. at 2420. To the contrary, it specifically noted that "[o]ther statutory grants and other alignments of parties and claims might call for a different result." *Id.* at 19, 96 S.Ct. at 2422.

The instant litigation is distinguished from *Aldinger* in several important aspects. First, unlike the factual setting in *Aldinger*, where the target third-party was an unwilling defendant, the third-party, State of Texas, is a willing plaintiff seeking merely to assert a claim against defendants already properly before the Court. The claims of the private plaintiffs are inextricably bound to the underlying obligation of the state to promote public peace and good order for her citizens. The wrongs complained of by the plaintiff class spring in large part directly from the operations sought to be suppressed by the State of Texas. As the United States Supreme Court and other courts have recognized, "intervention to promote a relevant public interest is permissible when the public official charged with primary responsibility for vindicating that interest seeks to defend it." *Nuesse v. Camp*, 385 F.2d 694, 705–706 (D.C.Cir.1967);

*SEC v. United States Realty & Improvement Corp.*, 310 U.S. 434, 460, 60 S.Ct. 1044, 1055, 84 L.Ed. 1293 (1940).

The second distinction between *Aldinger* and the instant litigation is that the statute upon which primary federal question jurisdiction was based in *Aldinger* specifically excluded the third-party as a defendant. In contrast, the federal civil rights statutes under which the present plaintiffs have brought suit, are aimed at the protection of the same basic legal and societal rights which the State of Texas seeks to defend by its claim in intervention. The Court cannot infer that Congress intended to preclude third parties, such as the State of Texas from invoking pendent party jurisdiction under the circumstances of this case.

 Importantly, judicial economy would best be served by allowing intervention. *See Aldinger* 427 U.S. at 18, 96 S.Ct. at 2422; *United Mine Workers v. Gibbs*, 383 U.S. at 726, 86 S.Ct. at 1139. *See generally* 3B J. Moore & J. Kennedy, *Moore's Federal Practice* ¶ 24.10[1] (2nd ed. 1981). The parties are before the Court and have completed argument in this proceeding which has been pending for over one year. The private plaintiffs have asserted their rights under the State's statute. No purpose would be served by requiring the State of Texas to institute a separate action in the state court. *See Boudreaux v. Puckett*, 611 F.2d at 1031. It follows that the State's intervention will not cause improvident delay, nor does its intervention unduly expand the scope of this controversy.[17]

The "common nucleus" and "Congressional intent" tests of *Aldinger* have been met

---

**17.** Plaintiffs argue additionally that the State of Texas is also entitled to intervene as a matter of right and accordingly no independent jurisdictional base for its intervention is necessary. Rule 24(a)(1) of the Federal Rules of Civil Procedure guarantees intervention where authorized by federal statute. Federal statute 28 U.S.C. § 2403(b) provides for intervention of right whenever the constitutionality of a state statute affecting the public interest is drawn into question. The scope of this statutory intervention is limited to presenting evidence and arguments in support of the constitutionality of the statute. *See e.g., Smolowe v. Delendo Corp.*,

36 F.Supp. 790, 792 (S.D.N.Y.1940). Given the nature of the affirmative relief requested by the State of Texas, the Court concludes that intervention under 28 U.S.C. § 2403 is inapplicable in this case. Plaintiffs also argue that the State of Texas has an interest in the enforcement of its own law, which is not precisely the same as the interest of the Vietnamese plaintiffs, and which the Vietnamese plaintiffs cannot adequately represent. Thus, plaintiffs argue that the State of Texas is entitled to intervene of right under Rule 24(a)(2) as well. Since this premise was not argued by the State, the Court will not pass upon its propriety at this time.

**216**

in this case. Consequently, this Court concludes that it has jurisdiction and the discretion to consider the State of Texas' injunction request.

### D. Enforceability of article 5780(6)

A predicate for enforcement of article 5780(6) is that the statute be constitutional. Essentially, the same considerations that authorize a grant of federal equitable relief from defendants' military operations confirm the constitutionality of this statute.[18]

 As discussed earlier, article 5780(6) is constitutionally sound under O'Brien. First, the State of Texas, pursuant to its police power, may enact and enforce laws to provide for the public safety and to protect its citizens from the threat of violence. Cf. City of El Paso v. Simmons, 379 U.S. 497, 508–09, 85 S.Ct. 577, 583, 13 L.Ed.2d 446 (1965) (state has sovereign right to protect general welfare of the people). Second, article 5780(6) was enacted to further the governmental interest of protecting citizens from the threat of violence posed by private military organizations. This is a vital governmental interest because the proliferation of private military organizations threatens to result in lawlessness and destructive chaos. Third, article 5780(6) is unrelated to the suppression of free expression as it in no way limits defendants from expressing any viewpoint they desire. The statute is designed merely to protect Texas citizens from private military organizations, regardless of the political ideologies of the persons operating such organizations.

 As also noted above, article 5780 does not violate the Second Amendment. The Second Amendment has not been incorporated into the Fourteenth Amendment and thus is not directly applicable to the states. Cf. United States v. Cruikshank, 92 U.S. 542, 23 L.Ed. 588 (1876). In Presser v.

Illinois, 116 U.S. 252, 6 S.Ct. 580, 29 L.Ed. 615 (1886), the Supreme Court rejected a Second Amendment challenge to statutory provisions materially identical to article 5780(6)[19] and stated, "a conclusive answer to the contention that [the Second] Amendment prohibits the legislation in question . . . [is] that the Amendment is a limitation only upon the power of Congress and the national government, and not upon that of the State." Id. at 265, 6 S.Ct. at 584. Accord, Eckert v. City of Philadelphia, 329 F.Supp. 845–46 (E.D.Pa.1971), aff'd, 477 F.2d 610 (3rd Cir. 1973), cert. denied, 414 U.S. 839, 94 S.Ct. 89, 38 L.Ed.2d 74 (1973). In upholding the constitutionality of the Illinois statute prohibiting private military organizations, the Supreme Court wrote:

> It cannot be successfully questioned that the state governments, unless restrained by their own constitutions, have the power to regulate or prohibit associations and meetings of the people, except in the case of peaceable assemblies to perform the duties or exercise the privileges of citizens of the United States, and have also the power to control and regulate the organization, drilling, and parading of military bodies and associations, except when such bodies or associations are authorized by the militia laws of the United States.

116 U.S. at 267–68, 6 S.Ct. at 585. Thus, in United States v. Miller, 307 U.S. 174, 178, 59 S.Ct. 816, 818, 83 L.Ed. 1206 (1939), the Supreme Court held that the Second Amendment's guarantee is limited to the right to keep and bear such arms as have "a reasonable relationship to the preservation or efficiency of a well regulated militia."

 Here, defendants' military operations obviously have absolutely no relationship whatsoever to any state or federal militia. In fact, defendants pride themselves on the fact that the TER is an alternative to Texas' state militia (Sisente Dep.

---

**18.** See Section III A supra.

**19.** Article XI, Section 5 of the Military Code of the State of Illinois provided in relevant part:
It shall not be lawful for any body of men whatsoever, other than the regular organized volunteer militia of this State and the troops of the United States, to organize themselves together as a military company or organization, or to drill or parade with arms in any City or Town of this State.

11–12). Consequently, the Second Amendment poses no bar to this Court's enforcement of article 5780(6).

### E. Defendants' Violation of 5780(6)

Although no Texas court has interpreted article 5780(6), this Court has no difficulty in concluding that defendants have violated its proscriptions. Texas regulates its state militia under a comprehensive legislative scheme, of which article 5780(6) is an integral part. Tex.Rev.Civ.Stat.Ann., art. 5765 et seq., (Vernon Supp.1982). A reading of this comprehensive scheme in its entirety reveals that the purpose of article 5780(6) is to prohibit the formation of any private military company or organization which would compete with the state military forces.[20]

By its express language, article 5780(6) prohibits both: (1) a body of men from associating themselves together as a military company or organization; and (2) the parading in public with firearms in any city or town of Texas.

In the absence of any legislative history on article 5780(6), the Court must rely upon judicial rules of construction in interpreting the scope of this statute. The

Fifth Circuit has stated "as a general rule, the use of a disjunctive in a statute indicates alternatives and requires that those alternatives be treated separately. Hence, language in a clause following a disjunctive is considered inapplicable to the subject matter of the preceding clause." Quindlen v. Prudential Insurance Company of America, 482 F.2d 876, 879 (5th Cir. 1973). See also United States v. Moore, 613 F.2d 1029 (D.C.Cir.1979). The use of the disjunctive "or" between the words "organization" and "parade" in article 5780(6),[21] demonstrates a legislative intent to proscribe two separate activities: the first against association as a military organization, and the second against parading in public with firearms. The requirement that the prohibited conduct take place in a city or town of the State applies only to the second of these prohibitions.[22] Thus, article 5780(6) makes illegal: (1) individuals associating as a military company; (2) individuals associating as a military organization; and (3) individuals parading in public with firearms in any city or town of Texas.[23]

The Statute's distinction between the prohibition against forming military organizations anywhere in the State, and the pro-

---

**20.** Compare article 5765 and article 5768, with article 5780(6). Tex.Rev.Civ.Stat.Ann., art. 5765 provides in relevant part that:

The militia of this State shall be divided into two classes, the Active and Reserve Militia. The Active Militia, herein referred to as the State Military Forces, shall consist of the organized and uniformed military forces of this State which shall be known as the Texas Army National Guard, the Texas Air National Guard, the Texas State Guard, and any other militia or military force organized under the laws of this State; the reserve militia shall consist of all those liable to serve, but not serving, in the State Military Forces. As used herein, the Texas Army National Guard and the Texas Air National Guard shall be referred to collectively as the Texas National Guard.

Tex.Rev.Civ.Stat.Ann., art. 5768 provides in relevant part:

In order to provide a reservoir of militia strength for use by the State of Texas as a supplement to the Texas National Guard, a Texas State Guard is hereby created, authorized and provided. The Texas State Guard is a part of the State Militia of Texas within the meaning of the Second Amendment of

the Constitution of the United States and a defense force within the meaning of Section 109 of Title 32, United States Code.

**21.** See note 14 supra.

**22.** In Vietnamese Fishermen's, 518 F.Supp. at 1015, this Court suggested that the Statute could be read to prohibit only those military organizations operating within a town or city. After full consideration of the briefs submitted on this issue, however, the Court concludes that the "city or town" limitation applies only to public parading with firearms.

**23.** The predecessor of article 5780(6) supports the proposition that the Texas legislature intended to prohibit the formation of private military organizations anywhere in the State. Tex. Rev.Civ.Stat. art. 3294 (1889) provided that "it shall not be lawful for any body of men whatsoever, other than the regularly organized volunteer guard, to associate themselves together as a military company or organization, or to parade in public with arms in any part of the State...."

hibition against parading in public with firearms is well reasoned. Military organizations are dangerous wherever they exist, because of their interference with the functioning of a democratic society and because of their inconsistency with the State's needs in operating its militia. By contrast, the Texas legislature could have easily concluded, that urban life presents special needs for civility and order, and also presents more frequent and easy occasions for disorder. Hence, in urban areas a prohibition against parading with firearms is needed, as a reasonable safety measure. In the case at bar, however, the applicability of the "city or town" limitation is of little moment because defendants have associated as a military organization both in and out of cities or towns, and have also paraded with firearms within at least two cities or towns.

 The evidence shows that the TER is a military organization which operates as the military arm of the defendant Knights of the Ku Klux Klan. This fact in and of itself establishes a violation of article 5780(6)'s prohibition of the formation of military companies or organizations. On at least three separate occasions, Klan-TER forces operated within the city limits of Texas towns or cities: twice to "protect" the Klan Bookstore in Pasadena, Texas and once to participate in the boat parade in Kemah-Seabrook. The evidence is not clear as to whether the appearances of the Klan-TER forces at the two Klan-fishermen rallies in Santa Fe, Texas were within the city limits of Santa Fe.

The defendants have also violated the prohibition against public parading with firearms. The record does not indicate how frequently such violations occurred, but it does amply reveal the Klan's penchant of using its troops for public displays. The record contains irrefutable proof of at least one armed boat parade, i.e., the March 15, 1981 incident, during which a shrimp boat manned by armed TER members sailed on

Clear Creek within the city limits of both Seabrook and Kemah. While article 5780(6) does not define "parade," the characterization of this incident as a parade is consistent with the participants own words (e.g. Stanfield Dep. 27–28); comports with local custom in the Seabrook-Kemah area; and properly reflects the fact that this incident had the features commonly associated with parades. The defendants' actions on March 15, 1981 took place on the thoroughfare most critical to the occupations of both the Vietnamese and the American fishermen whom the Klan purported to be helping. This boat parade merely compounded defendants' violation of article 5780(6).

 Defendants' repeated violations of article 5780(6) have been established. The State of Texas is clearly entitled to seek an injunction against any future violations in order to protect the rights of Texas residents and citizens.[24] Moreover, as has already been discussed, the defendants' association and parading as a military organization has specially injured the plaintiff class. Victims of discrimination suffer irreparable injury, regardless of pecuniary damage. *See United States v. Hayes International Corp.*, 415 F.2d 1038, 1045 (5th Cir. 1969); *Ethridge v. Rhodes*, 268 F.Supp. 83 (S.D.Ohio 1967). Accordingly, plaintiffs have no adequate remedy at law for their injury. The Klan's demonstrated affection for the public display of its troops, and for military organization generally, compel this Court to conclude that future violations of article 5780(6) are likely. Moreover the potential for future assaults on the rights of the plaintiff class is particularly evident. Plaintiffs, therefore, are entitled to equitable relief to secure the protections provided under article 5780(6). No segment of this society can be allowed to threaten, harass or intimidate any other segment of society because of its race or national heritage. The Knights of the Ku Klux Klan by and through the Texas Emergency Reserve has done just that and must be enjoined from

---

24. *See I.B.E.W. Local 324 v. Upshur-Rural Electric Cooperative Corp.*, 261 S.W.2d 484, 485 (Tex.Civ.App.1953), wherein the Court of Civil Appeals held that the injunctive power of

the courts may protect against an invasion of the plaintiff's rights when neither penalties nor remedial procedures are provided under the relevant statute.

any future assaults on the plaintiffs' rights. The Knights of the Ku Klux Klan's primary vehicle for threats, harassment and intimidation is their military activities and training by and through the Texas Emergency Reserve. This Court is compelled to enjoin such military activity and training.

## CONCLUSION

Over the years, members of various Klan organizations have engaged in acts of racial intimidation, harassment and terrorism. *See e.g., United Klans of America v. McGovern*, 453 F.Supp. 836, 838–839 (N.D.Ala. 1978), *aff'd* 621 F.2d 152 (5th Cir. 1980); *United States v. Crenshaw County Unit of United Klans of America*, 290 F.Supp. 181 (M.D.Ala.1968); *United States v. Original Knights of the Ku Klux Klan*, 250 F.Supp. 330 (E.D.La.1965); *United States v. U. S. Klan, Knights of the Ku Klux Klan, Inc.*, 194 F.Supp. 897 (M.D.Ala.1961). Members of the Ku Klux Klan are now engaged in military training programs in Texas and apparently throughout the country.[25] The existence of Klan sponsored military organizations which train people in the use of violence presents a new and more serious threat to individuals' civil rights. Regardless of whether it is called "defense training" or "survival courses," it is clear to this Court that the proliferation of military/paramilitary organizations can only serve to sow the seeds of future domestic violence and tragedy. For the reasons discussed above, the Court is compelled to grant the injunctive relief sought by plaintiffs and the State of Texas.[26]

Accordingly, it is ORDERED, ADJUDGED, and DECREED that defendant Louis Beam and the Knights of the Ku Klux Klan are hereby permanently enjoined from: 1) continuing to maintain or to associate themselves into private military or paramilitary companies or organizations, including but not limited to the Texas Emer-

gency Reserve; 2) carrying on military or paramilitary training including specifically all forms of combat and combat-related training; 3) parading in public on land or water, with firearms; and 4) engaging in any other activities which have as their purpose or reasonably foreseeable effect the use or threatened use of military or paramilitary force to infringe upon the civil rights of the plaintiff class.

Plaintiffs are directed to submit a proposed final judgment within five (5) days of the entry of this Order.

## FINAL JUDGMENT

Based upon the Orders entered herein on May 14, 1981, August 13, 1981 and June 3, 1982, the Memorandum Opinions issued by the Court, and the evidence presented in this case, it is the FINAL ORDER, DECREE, and JUDGMENT of the Court that:

1. The organizational defendants, the Knights of the Ku Klux Klan for the State of Texas and the American Fishermen's Association and/or Coalition, and their agents, employees, officials, officers, members, assigns, and successors; and the individual defendants, Louis Beam and Eugene Fisher, in their individual capacity and as Grand Dragon of the Knights of the Ku Klux Klan for the State of Texas and President of the American Fishermen's Association and/or Coalition, respectively; and all others acting in concert or participation with these defendants, are permanently enjoined from:

a) Engaging in unlawful acts of violence or intimidation against the plaintiff class, including, but not limited to:

 (i) the placing of an armed person or persons within the personal view of the class of Vietnamese fishermen, their boats, or Vietnamese owned and/or operated establishments

---

**25.** *See Report to National Executive Committee Anti-Defamation League of B'nai Brith*, (Oct. 1980).

**26.** Pursuant to the Court's August 13, 1981 Order, defendants Louis Beam, the Knights of the Ku Klux Klan, Eugene K. Fisher, the Ameri-

can Fishermen's Coalition, and certain unknown members of the Ku Klux Klan or of the American Fishermen's Coalition are permanently enjoined from the actions set forth in n. 7 *supra*.

with the intended purpose or having the reasonable foreseeable effect of intimidating members of the plaintiff class;

(ii) the burning of crosses on property within the geographic area where members of plaintiffs' class live and/or work without the consent of the owner of said property; or

(iii) gatherings of two or more robed members of the Knights of the Ku Klux Klan within the personal view of members of the class.

b) Engaging, or inciting others to engage, in acts of boat burning, armed boat patrols, assault and battery, or threats of such conduct; and

c) Any other unlawful activities undertaken with the intended purpose or having the reasonably foreseeable effect of intimidating or harassing the members of the plaintiff class.

2. The Knights of the Ku Klux Klan for the State of Texas, and its agents, employees, officers, officials, members, assigns, and successors; and the individual defendant, Louis Beam, in his individual capacity and as Grand Dragon of the Knights of the Ku Klux Klan for the State of Texas; and all others acting in concert or participation with these defendants, including, but not limited to, the Texas Emergency Reserve, are permanently enjoined from:

a) Continuing to maintain or to associate themselves into private military or paramilitary companies or organizations, including, but not limited to, the Texas Emergency Reserve;

b) Carrying on military or paramilitary training, including all forms of combat and combat-related training;

c) Parading in public on land or water, with firearms in any city or town of the State of Texas; and

d) Engaging in any other activities which have as their purpose or reasonably foreseeable effect the use or threatened use of military or paramilitary force to infringe upon the civil rights of the plaintiff class.

3. Plaintiffs shall recover the costs incurred in prosecuting this action. Said shall be taxed against the defendants.

4. Plaintiffs shall be awarded reasonable attorneys' fees. The parties are directed to meet and attempt to reach agreement on the amount of such fees within ten days of the entry of this Judgment. In the event the parties cannot agree on a reasonable attorneys' fee, the Court shall set said fee upon the receipt of affidavits from the parties in support of and in opposition to the amount of said fee. Said fees shall be taxed against the defendants.

It is further ORDERED that this Judgment will be posted in conspicuous places in the Kemah-Seabrook area.